[Crim. No. 21159. Dec. 8, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD JOHN MROCZKO, Defendant and Appellant.

88

**COUNSEL**

Sanford Jay Rosen, under appointment by the Supreme Court, Kathleen J. Purcell, Rosen & Remcho and Barbara Phillips for Defendant and Appellant.

John K. Van de Kamp and George Deukmejian, Attorneys General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Nancy Sweet and Vincent J. Scally, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

KAUS, J.—On May 22, 1978, Jay Love, an inmate at the California Men's Colony (CMC) was found dead in his cell, asphyxiated by a metal coat

hanger wrapped around his neck. Four months later, Richard Mroczko and Thomas Brindle, fellow inmates, were charged with Love's murder. After a six-week trial in the San Luis Obispo County Superior Court, during which Brindle and Mroczko were represented by the same counsel, Mroczko was convicted of first degree murder and eventually sentenced to death. Brindle was convicted of second degree murder and sentenced to a term of seven years. Mroczko's appeal to this court is automatic. (Cal. Const., art. VI, § 11; Pen. Code, § 1239, subd. (b).)

We hold that as a result of the joint representation of Mroczko, Brindle, and Dennis Hall—a witness to and uncharged suspect in Love's death— Mroczko was denied effective assistance of counsel. His conviction must therefore be reversed.[1] We further hold that in the future separate and independent counsel should be appointed for jointly charged indigent defendants at the outset of criminal proceedings.

I

The prosecution's case against Mroczko was based almost entirely on six inmate witnesses: Louis Archuleta, Mark Asbill, Jerry Daniels, Marcelino Garcia, Ralph Jones, and Robert Schneider. These witnesses testified generally that Mroczko and Love had been sexually involved, that they fought on the morning of May 22, 1978, that Mroczko, Brindle, and possibly Hall—another inmate—murdered Love, and that Mroczko made a number of damaging admissions.

The evidence tying Mroczko to the murder was strong. However, the inmate witnesses disagreed on virtually all the particulars of the crime— especially the respective roles of Mroczko, Brindle and Hall.

At the time of Love's death, Mroczko, Brindle and Love lived in nearby cells. While Mroczko and Love had been sexually involved, they quarreled often during the two weeks before Love's death. A guard testified that Mroczko was attempting to break off his relationship with Love. Between 8:30 and 9 a.m. on the morning of the murder, Jerry Daniels, an inmate who lived on the same corridor as Mroczko, saw Mroczko, Brindle and Dennis Hall standing in front of Hall's cell. At trial, Daniels testified that Mroczko said, "I think we ought to kill him." Hall added that "[h]e needs to be killed." Hall was "stirring it up" and "wanted to see something happen." Brindle said little except that he wanted to "kick his ass" but did not want

---

[1]Brindle's conviction was reversed in an unpublished opinion by the Court of Appeal, Fifth Appellate District (*People* v. *Brindle* (Mar. 30, 1983) 5 Crim. 4610, hg. den. July 14, 1983) for substantially the same reason.

to kill the person they were discussing. Daniels did not know at the time who was being discussed but the person was "supposed to be an informant."

Pretrial, Daniels had given a different version of this story to Richard Moreno, a state investigator. Moreno testified Daniels told him that *Mroczko* wanted to "kick Love's ass to get him to shut up" but it was *Brindle* who thought Love should be "taken out completely." Daniels explained to Moreno that Brindle had a particular motive to kill Love: to prevent him from "snitching" and jeopardizing his upcoming parole.[2]

Later the same morning Louis Archuleta, Robert Schneider, Mark Asbill and Ralph Jones heard Mroczko and Love arguing.[3] About 9:30 or 10 a.m., Archuleta saw Mroczko enter Love's cell. About two hours later he heard someone scream "Louis." The scream was cut off and Archuleta heard what sounded like kicking against the metal cell wall. Archuleta left his cell to check the time. It was 11:27 a.m. He then picked up a broom and began to sweep the hallway. As he passed Love's cell, he looked through a crack between the door and wall and saw Brindle crouching, looking out, as though watching for guards. Although he did not see Mroczko, Archuleta knew he was still inside the cell because he would have had to pass Archuleta's open cell door to leave the area. According to Archuleta, Brindle and Mroczko remained in Love's cell during the 11:30 lockup.[4]

---

[2]In final argument the prosecution relied on Daniels' pretrial version—that Brindle wanted to kill Love while Mroczko wanted only to "kick his ass"—arguing that Brindle's motive was to prevent Love from jeopardizing his parole.

[3]Archuleta, who lived in a cell across the hall from Love, saw and heard Mroczko, wearing gloves, pounding on Love's door at about 9:15 to 9:30 a.m. Mroczko yelled repeatedly: "Open the door, motherfucker." Love told him to leave him alone and go away. Eventually Mroczko calmed down and lowered his voice. Archuleta heard him say "Get out of my life or get in it, motherfucker," and "I wish you would get a blade and cut your wrists or cut your neck." He also said, "Open up or I'll press your neck."

About 9:30 a.m., Ralph Jones was returning from his prison job. Passing Love's cell, he saw an argument in progress. Inside the cell, he saw Mroczko holding Love against the wall by his throat. Jones thought Mroczko was trying to get a "point across." Jones also saw Dennis Hall in Love's cell. Outside the cell, he saw Todd Young who he thought was serving as a lookout.

Mark Asbill testified that he heard Love and Mroczko arguing from about 10 to 10:30 a.m.

Between 11 and 11:30 a.m., Robert Schneider heard an argument from his cell, and went into the hall to see what was going on. He saw Mroczko banging on Love's door and arguing about who was the man and who was the woman in the relationship. Love opened the door and admitted Mroczko.

[4]Prisoners at CMC are generally free to come and go from their cells. Lockups occur five times a day, at 1:30 a.m., 5:30 a.m., and 4 p.m., when inmates must be in their cells, and at 11:30 a.m. and 10 p.m. when inmates must be in their cells or in the television room. The prisoners are locked in their cells between 1:30 and 5:30 a.m.

Marcelino Garcia testified that after the 11:30 lockup ended, he went to pick up a friend, Jose Lopez, to go to lunch. Garcia lived in another section of the building, but Lopez's cell was on Love's hall. As Garcia walked down Love's hall, he saw Mroczko and Brindle enter Love's cell. Garcia looked through the window of Love's cell door, hoping to see a sexual act. Instead, he claimed to have seen Brindle squeezing Love's neck with a wire or rope and Mroczko holding Love from behind. He then contradicted himself, testifying instead that Brindle held Love while Mroczko had him by the neck.[5] Garcia watched for a few seconds and then continued down the hall to his friend's cell. After discovering that Lopez was not in, he walked back down the hall and again looked into Love's cell. This time he saw Love spitting saliva as Brindle and Mroczko were placing him on the bed.

About 1 p.m. that afternoon, a broken sink caused a flood in the hallway. Archuleta saw Mroczko in the hall and told him that water was running into his cell and that his belongings were getting wet. Instead of mopping his own cell, Mroczko was "all excited" and used a broom to keep the water from flowing further down the hall in the direction of Love's cell. Dennis Joller, a guard on the floor, also noticed that Mroczko seemed anxious to keep the water from flowing in the direction of Love's cell.

At 3:30 p.m.—hours after all other prosecution evidence suggested Love was killed—Ralph Jones heard Love yell: "You dirty bastard." Mroczko and Brindle were in Love's cell at the time.

In the evening, Garcia, who was apparently still unaware that he had witnessed a murder rather than a sex act, approached Mroczko in the television room and said: "I saw what you did." Mroczko got red in the face and told him to go away.

A number of other witnesses testified to admissions and incriminating conduct by Mroczko. However, all of these "admissions" suggested that the murder was not premeditated. Between 11 a.m. and noon of the day of the murder, Mark Asbill heard Mroczko tell Todd Young, "I didn't mean to." He repeated the phrase two or three times. Robert Schneider saw Mroczko leave Love's cell, shaking badly. Later in the day he heard Young say to Mroczko: "I didn't know you were going to kill him." Mroczko did not respond. Late in the evening, Ralph Jones heard Brindle call Mroczko a "stupid asshole." In response, Mroczko told Brindle to get off his back and that it was an accident. Mroczko sounded upset. Brindle was angry.

---

[5]On cross-examination, Garcia confirmed the version of the story in which Mroczko was more culpable.

During the 10 p.m. lockup, guard King noticed that Love had been lying in the same position on his bunk since the 4 p.m. lockup when he had assumed Love was asleep. King entered the cell, removed the blanket covering most of Love's body and face, and discovered a wire hanger wrapped tightly around Love's neck. An autopsy determined Love died as a result of strangulation by means of the wire coat hanger. The pathologist who conducted the autopsy concluded that his death was not a suicide because of the tightness of the loops in the hanger and the fact that the hanger had been knotted twice. He believed Love could not have made the second knot before passing out. In addition, bruises on Love's right palm were "defensive" and consistent with trying to push away a wire.

After Love's body was discovered, Mroczko was interviewed by county detectives. When asked if he had any idea who killed Love, Mroczko stated that he did not but that back in New York coat hangers were a common way to kill people. The detectives had not told Mroczko how Love was killed. When they asked Mroczko how he knew that Love had been murdered by the use of a coat hanger, Mroczko claimed he had heard another officer discussing it.

The prosecution also presented evidence that Mroczko's weightlifting gloves—"dobermans" as he called them—had miniscule black paint chips on them. After extensive analysis, these chips were determined to be "consistent" with the paint on the hanger used to kill Love—i.e. the paint could only have come from a "fairly limited population of black alkyd finishes formulated exactly like the finish" on the coat hanger.[6]

Mroczko's and Brindle's defenses were based on separate alibis. Brindle claimed that he was working as a quality control inspector in the prison laundry from 8 to 11:50 a.m., and went directly to lunch from the laundry. His testimony was corroborated by a number of defense witnesses. Mroczko, on the other hand, had an incomplete alibi. Dennis Hall, Mroczko's best friend, testified that he dropped by Mroczko's cell after 11 as he was returning from his prison job. He stayed until the 11:30 lockup. After the lockup he went to pick up Mroczko to go to lunch and found him dozing in his cell. They lunched together. This still left Mroczko without an alibi for most of the morning, including the crucial period of the 11:30 lockup.

---

[6]Defense experts reached the opposite conclusion. However, because the paint found on the gloves was destroyed during the prosecution's testing, defense experts were unable to directly compare the paint found on the gloves and that on the hanger used to strangle Love. While the paint chips did not come from a number of other sources of black paint found elsewhere in the prison, prosecution experts conceded that their analysis did not totally eliminate the possibility that the paint came from another source.

Mroczko admitted that he had had the opportunity to kill Love and that he had been attempting to end his friendship with him.[7]

The primary thrust of the defense was to impeach various prosecution witnesses, particularly the sole purported eyewitness, Garcia. Garcia had come forward more than four months after the murder. His version of the events on May 22 differed from that of all other prosecution witnesses—except possibly Jones—because he testified that the murder occurred after the 11:30 lockup. More important, Garcia could not adequately explain how he came to witness the murder in the first place. Garcia did not live on the same hall as Love but testified that when he saw Mroczko strangling Love, he was on his way to go to lunch with Jose Lopez, an inmate on Love's hall. However, Lopez, called by the defense, testified that he was not a close friend of Garcia and that Garcia would have had no reason to come to his cell on May 22. Narciso Gomez, on the other hand, testified that he was Garcia's closest friend and best man at his wedding. Gomez went to all meals with Garcia, including lunch on the day of the murder. He stated that they did not go through Love's side of the cell block on the way to lunch. Nor did Garcia mention seeing anything unusual that day. The defense also presented evidence suggesting Garcia had an ulterior motive for testifying: he was being hunted by prison gangs because he had refused to perform a "hit." By testifying against Mroczko, he hoped to be placed in protective custody.[8]

The defense proposed two alternative theories of how Love died. The first was that he had committed suicide. To support this theory, the defense showed that Love, who had been sentenced to prison for life without possibility of parole, was in poor physical condition, suffering from asthma and

---

[7]He denied, however, that he had had a sexual relationship with Love or that he had ever been inside Love's cell. He also asserted that the conversation with correctional officers concerning coat hangers "didn't happen." However, after Dennis Hall testified that he had seen Mroczko in Love's cell two or three times, Mroczko retook the stand and admitted that he had been in Love's cell "a lot of times," but had been afraid to admit it because the prosecution would "make it look like a sex trip." He further admitted that he had mentioned coat hangers when he was interviewed by the correctional officers but maintained that he had only admitted that they are "commonly used for abortions." Mroczko claimed that the officers raised the subject of the coat hangers in the interview. On rebuttal, one of the officers denied this claim.

[8]What emerges from the murky record with striking clarity is that the inmate witnesses—both defense and prosecution—were generally unreliable. The transcript reveals that prison life is fraught with animosities and alliances motivated in ways that the uninitiated could scarcely imagine. Thus, for example, Mroczko alleges that Archuleta was biased against him because of a fight Mroczko had had with one of Archuleta's friends over television programs. Similarly, Jones was biased because of a fight with Mroczko over money Jones allegedly stole from the prison minicanteen. The prosecution was quick to suggest a countervailing consideration: by testifying against a fellow inmate, witnesses were literally risking their lives.

severe emphysema, was severely depressed and emotionally unstable. On a number of occasions Love had mentioned to Mroczko and others that he was considering suicide and, 11 days before his death, he had put his hand through a window causing a minor cut to his wrist. However, a doctor who had treated the wound stated that it did not appear to be the result of a suicide attempt. Furthermore, the pathologist's testimony was that Love could not have committed suicide. The defense presented no experts to refute this testimony.

The other defense theory was that Love was heavily in debt and was killed by someone to whom he owed money. Witnesses testified that Love had bought items on credit which he later destroyed in tantrums and that he was under heavy pressure to pay off his debts. One inmate testified that Love had asked to borrow $50 on the day he died to pay off a "Chicano group" that had threatened to kill him if he did not pay.

After four days of deliberations, the jury found Mroczko guilty of first degree murder and Brindle guilty of second degree murder. The special circumstances phase consisted entirely of the introduction of documentary evidence that Mroczko had previously been convicted of second degree murder in the death of one Joseph Moran. (Former Pen. Code, § 190.2, subd. (c)(5).) The jury found the special circumstance to be true.[9]

At the penalty phase, the prosecution introduced three witnesses who testified about Mroczko's prior murder conviction. The defense presented no witnesses. In a very brief final argument, defense counsel contended that the crime of which Mroczko was convicted did not justify the death penalty, and that he would be punished sufficiently by a sentence of life in prison without the possibility of parole. The jury took 55 minutes to sentence Mroczko to death. Motions for new trial and modification of sentence were denied on September 13, 1979.

## II

A recital of the facts which led to the representation of Mroczko by counsel with conflicting interests is tedious but necessary.

In the days following Jay Love's death, suspicion focused on four men: Thomas Brindle, Dennis Hall, Richard Mroczko, and Todd Young. All four were placed in segregation and, while thus confined, consulted with attorneys from Carsel Corporation, which held the public defender's contract in San Luis Obispo County. Carsel then represented the four in habeas corpus

---

[9]No special circumstance was charged against Brindle.

proceedings regarding the right of prisoners to consult with the public defender before his appointment to represent those prisoners. (See *In re Brindle* (1979) 91 Cal.App.3d 660 [154 Cal.Rptr. 563].) These consultations included conversations with Attorney Umhofer, an employee of Carsel, who later represented Mroczko and Brindle at trial. Ultimately, Hall and Young were released from segregation and no charges relating to Love's murder were filed against either.

At arraignment in the municipal court, Umhofer was appointed to represent Mroczko. Separate counsel, Don Ernst, was appointed for Brindle. Problems began soon, however. At a hearing on Ernst's motion for funds to hire a private investigator for Brindle, Umhofer expressed his belief that funds for the investigator should come from the court's budget "and that defendant Brindle should not have to look to the Public Defender Contract for funding of his defense inasmuch as a separate attorney had been appointed on the basis of a perceived conflict of interest between the defendants. Judge Conklin disagreed, saying . . . Carsel had a contract with the county which obligated [the] firm to bear said expenses . . . ." Umhofer then argued that the appointment of separate counsel was premature, "[i]nasmuch as the public defender had not declared a conflict and had not been given an opportunity to determine if there was one." The court vacated the appointment of Ernst and instructed the public defender to investigate whether a conflict existed. The matter was continued to October 18, 1978, when Umhofer reported that "there was no conflict, and . . . no reason his office could not represent both defendants." Both defendants stated they were satisfied with Umhofer's representation and the court reaffirmed the order appointing Umhofer to represent Brindle.

The prosecutor first raised the issue of separate representation in the municipal court on November 1, 1978, suggesting that the record might not contain waivers by the individual defendants concerning representation by the same attorney. The court asked each defendant whether he felt a conflict existed which would preclude Umhofer from representing him properly. Both defendants stated that they knew of no conflict and were satisfied with Umhofer.

The prosecution next raised the issue in the superior court on March 15, 1979, during a pretrial conference. Expressing concern that proceeding with the single counsel would be "error per se" in the absence of a valid waiver, the prosecution asked the court to explore possible conflicts. Umhofer countered that he had previously "declared that there was no conflict between the defendants" and that the municipal court had "rather precipitously . . . appointed other counsel . . . before we had an opportunity to decide if there was a conflict . . . ." The court then inquired of the defen-

dants. Brindle stated that he had discussed joint representation with Umhofer and concluded that he is "perfectly competent to represent both of us because there is no conflict of interest, that is to say, I have nothing to say about Mroczko, where he was or whatever, and he has nothing to say about me. We were in two different places." Similarly, Mroczko stated that he was satisfied with Umhofer and that "if another attorney was assigned it would only do damage to us instead of help us."[10]

Two weeks later, the prosecution filed a motion to disqualify the public defender's office, describing what it identified as an unwaivable conflict of interest. The conflict raised was Carsel's representation of Hall and Young, both of whom were potential witnesses in the case and, as noted, had previously been suspects in Love's murder. The issue was addressed briefly on April 2, 1979, when Umhofer requested additional time to respond to the district attorney's conflict of interest concerns and asserted that any conflict of interest could be waived. Umhofer refused to concede "that there is an adverse interest between [Hall and Young] and these defendants." The deputy district attorney also brought up the fact that the defendants had been offered different pleas. The court ordered further briefing on the issue.

Umhofer filed a responding declaration stating that Carsel continued to represent Hall but no longer represented Young. Although Umhofer admitted that he had had conversations with Hall and Young, the declaration indicated that the only discussions of the facts of Love's death "in an attorney-client capacity" had been with Brindle and Mroczko.[11] Attached to the declaration were statements by Hall and Young purporting to consent to Umhofer's representation of Mroczko and Brindle and investigative reports of statements made by Hall and Young. One report, a statement made by Young to Investigator Moreno and Deputy District Attorney Weldon, inculpated Hall in Love's death. Young had stated that about 4 p.m. on the

---

[10]The court also inquired as to Brindle's and Mroczko's education. Brindle had graduated from the eleventh grade and Mroczko had graduated from high school, had "three years of psychology, and a counseling degree."

[11]Umhofer's declaration stated: "I admit to conversations with Thomas Brindle, Richard Mroczko, Dennis Hall, Todd Young, and Joe Siede, between June 14, 1978 and the present. Additionally, I am informed and believe that those persons had conversations with another attorney of our firm . . . on several occasions in June, July, and August, 1976. The only persons with whom I have discussed the facts of the case of the death of Jay Love in an attorney-client capacity are Thomas Brindle and Richard Mroczko, and these conversations did not take place until October, 1978 after our firm had been appointed by the Judge of the Municipal Court to represent the two individuals in this pending criminal action. I purposely avoided discussion of the facts, circumstances, and defenses which any five of my original clients might have had with respect to the investigation which was progressing during June, July, August, and September, 1978. Dennis Hall has spoken to my investigator, Jack West, in December, 1978 as part of Mr. West's over-all reinvestigation of the matter; it was not in an attorney-client capacity. In December, 1978, Todd Young refused to discuss the matter with Mr. West, referring him to his attorney, Mark Woolpert."

day of Love's death, he had had a conversation with Hall in which Hall stated: "We don't have to worry about Love anymore, I took him out. . . . I killed him in his room." According to Young, Hall described the events surrounding Love's death in the following manner: "On the date in question, defendant Mroczko and Dennis Hall were in victim Love's room. Inmates Hall and Love were seated on the bed, Mroczko was standing near the sink area of the cell. . . . [I]nmate Hall attempted to choke victim Love with a length of cord, but the cord broke as it was wrapped around victim Love's neck.[12] At that time inmate Hall began choking victim Love with his hands and told defendant Mroczko to help him by holding down victim Love's feet, in order that the victim wouldn't kick or urinate on himself while being choked. Inmate Hall continued choking victim Love while defendant Mroczko was watching and . . . Mroczko did not assist in the activity, but stood above the bed and urinated in his own pants. At that time inmate Hall obtained a metal coat hanger from within the cell and placed it around the neck of victim Love and began twisting the coat hanger until it broke. After inmate Hall had successfully choked inmate Love he covered the body with a blanket and both he and defendant Mroczko left the room and went about their normal business."

Addressing this statement, Umhofer's declaration states: "I have every reason to believe that Mr. Young will testify along the lines of the statement which he gave to the authorities . . . . Such testimony would not be admissible and relevant to either of my clients. It is conceivable, however, that Young may be used as a rebuttal witness by the prosecutor to impeach the testimony of Dennis Hall, were he to testify along the same lines as his previous statements. However, this is speculative." At trial Young was not called as a witness by either side. Hall, as noted, was Mroczko's alibi witness.

Another hearing was held on April 9, 1979. At that time, the prosecution was permitted to describe the conflicts it foresaw and the court asked the defendants whether they were willing to waive each.[13] The prosecution first presented a general explanation of the problem posed by multiple representation of codefendants—that it might be difficult for defense counsel to protect each defendant's interest equally. Brindle stated that he understood the potential problem but did not think it would arise in this case. Mroczko simply answered "yes, your honor," in response to the court's inquiry as

---

[12]A broken cord was found at the murder scene.

[13]Throughout the proceeding, the prosecution maintained that the conflicts were so serious that they could not be waived. The court, however, insisted that a waiver was possible, and asked the prosecution to state the conflicts it foresaw. After the prosecutor stated each conflict, the court paraphrased the conflict and asked each defendant if he was willing to waive it.

to whether he was "willing to accept the possible risk and consequences" of multiple representation. The prosecutor next explained that Umhofer's representation of Hall and Young could limit his ability to "aggressively or conscientiously attack [their] credibility" as witnesses. Both defendants stated, without elaboration, that they were willing to accept the risk.[14] Finally, the prosecutor attempted to raise the issue of plea bargains, but the judge refused to permit the proposed bargains to be revealed, fearing it would prejudice his ability to make an independent evaluation of the jury's verdict. The pleas were described generally as "inconsistent" in that an offer was made to one defendant to plead to a lesser offense than was offered to the other defendant, and that one defendant was offered to plead to a lesser offense in exchange for his testimony against the other. Both defendants stated, without elaboration, that they were willing to waive any conflicts that may have existed.

The prosecution complained bitterly about its inability to negotiate with Umhofer, given his dual role. "[F]rom our point of view it's been somewhat difficult to communicate to Mr. Umhofer because of our belief that he is in an untenable position, if inconsistent offers are made, that is, an offer of a plea by one defendant to a crime that is somewhat heavier or carries a greater penalty than the other defendant. And, further, having one defendant . . . plead to a lesser charge in exchange for his testimony against the other defendant . . . . I quite frankly don't see how one attorney representing two defendants can sit down with one or the other or both and . . . thoroughly discuss the ramifications of an offer such as this . . . ."

Responding to the prosecution's concerns, the judge offered to appoint a separate attorney for the purpose of discussing the plea bargains with the defendants. After defense counsel objected that proceeding in this manner would violate the attorney-client privilege, the judge modified his offer,

---

[14]At this point, Umhofer entered into a lengthy conversation with the deputy district attorney and the court, in which he asserted that no conflict existed between these individuals: "I don't understand the district attorney's concern here, because the declarations indicate in . . . regard to Mr. Hall, that he does not have anything adverse to say about either of these defendants and, in fact, as the court may read my declaration in the attached exhibit, the information in the hands of the district attorney also indicates that that man has no adverse testimony to give about the defendants in this case.

"With respect to Mr. Young's testimony, his testimony certainly indicates the People's case in chief is not relevant or admissible. It may come up possibly by way of rebuttal as a hackle in Mr. Hall's testimony, but as I have indicated, I think that is speculative. Secondly, both have declared that they have not given the law firm of Richard Carsel or me any confidential information with respect to this case, and I think it does away with this concern that I may be in some form ineffective in being able to examine them, because I have no confidential information with which I must be concerned . . . when I examine them. I think that the district attorney's argument is a general concern which is in the abstract and does not address the factual situation that is presented."

suggesting that separate counsel be appointed to determine "whether [defendants] should have independent counsel." However, Umhofer responded: "I understand that, Your Honor. I think ultimately the court has to give that advice and it should be on the record as we are doing now, and if the defendants want to have another attorney appointed, then whoever it is is going to have to review the mounds of material involved in order to properly assess the nature of Mr. Brindle's, for instance, posture in the case. And I think that the court up until asking him if he wanted a special lawyer . . . was on the right course in advising the defendant, getting the answer on the record and doing it that way . . . . I think it is really a question of I am to continue to represent the defendant or he is to have another attorney." Both Mroczko and Brindle then indicated that they did not want separate attorneys to advise them regarding the plea bargains.

Finally, the prosecution attempted to raise the problem of the Young declaration—pointing out that statements by Umhofer's two former or current clients raise credibility questions as to those individuals and that it would be difficult for counsel to impeach Hall and Young with their own prior declarations. However, Umhofer contended that he did not "see that that puts [Hall and Young] or me in any kind of a bind." Agreeing, the court did not "think that there is a further basis for the conflict" in the declaration. It then denied the prosecution's motion to disqualify Umhofer.

The prosecution then sought a writ of mandate in the Court of Appeal directing the trial court to grant its motion for separate counsel. The Court of Appeal held that "a conflict of interest arose from [the inconsistent plea] offer which prevents the public defender from effectively representing the client to whom the offer was made . . . ." (*People* v. *Superior Court* (*Mroczko*) (1979) 94 Cal.App.3d 626, 629 [156 Cal.Rptr. 487].) Although the court had found that defendants "may knowingly and intelligently waive the conflict of interest, . . ." it concluded that the trial court failed clearly to inform the defendants that their lawyer had a present conflict of interest. (*Id.*) A proper waiver, the Court of Appeal noted, "requires that the plea bargain offered by [the prosecution] be stated for the record so that the resulting conflict of interest may be adequately described and discussed." (*Id.*)[15] A peremptory writ of mandate was issued, directing that a new waiver hearing on the plea bargains be held before a judge who would not be presiding at trial.

---

[15]The court also observed in a footnote that, if the contract public defender representing defendants had a financial stake in representing both, that stake must be revealed. Although the Hall/Young matter was raised in briefs before the Court of Appeal, the court did not discuss it. The court also did not discuss other conflicts that arose or might arise from the joint representation of Brindle and Mroczko due to differences in the evidence, the different penalties sought, and so on.

Further proceedings were held before a different judge on May 16, 1979, at which time the prosecutor explained the plea bargain offers for the record. Two plea bargains had been offered. The first, offered only to Brindle, was to plead guilty to a single charge of accessory after the fact in exchange for testimony against Mroczko. The second was a "package" bargain—Mroczko was to plead guilty to second degree murder and Brindle to having been an accessory after the fact. No offer was made to Mroczko alone. Each defendant stated that he understood the offers, had been advised of them by Umhofer, and was not interested in accepting them. The trial court also asked whether Mroczko had "been made aware on other occasions . . . that [Umhofer] may have a real or apparent conflict of interest?" Mroczko responded: "I've have been made aware of it, but I don't believe it."

### III

■ Multiple representation of criminal defendants is not per se violative of constitutional guarantees of effective assistance of counsel. (*Cuyler* v. *Sullivan* (1980) 446 U.S. 335, 348 [64 L.Ed.2d 333, 346, 100 S.Ct. 1708]; *Holloway* v. *Arkansas* (1978) 435 U.S. 475, 482 [55 L.Ed.2d 426, 433, 98 S.Ct. 1173]; *People* v. *Barboza* (1981) 29 Cal.3d 375, 378 [173 Cal.Rptr. 458, 627 P.2d 188]; *People* v. *Chacon* (1968) 69 Cal.2d 765, 773-774 [73 Cal.Rptr. 10, 447 P.2d 106, 34 A.L.R.3d 454].) However, in the absence of a knowing and intelligent waiver, courts have frequently struck down convictions because of conflicts of interest between codefendants. (See, e.g., *Glasser* v. *United States* (1942) 315 U.S. 60 [86 L.Ed. 680, 62 S.Ct. 457]; *Holloway* v. *Arkansas, supra,* 435 U.S. 475; *People* v. *Chacon, supra,* 69 Cal.2d 765.)

■ "[I]n every case of multiple representation, there exists a likelihood, if not a certainty, that the strategic maneuvers of the criminal defense attorney will adversely affect the interests of at least one defendant at some point in the trial process." (Geer, *Representation of Multiple Criminal Defendants: Conflicts of Interest and the Professional Responsibilities of the Defense Attorney* (1978) 62 Minn.L.Rev. 119, 136 (hereafter *Geer*); accord Lowenthal, *Joint Representation in Criminal Cases: A Critical Appraisal* (1978) 64 Va.L.Rev. 939, 952 (hereafter *Lowenthal*); Tague, *Multiple Representation and Conflicts of Interest in Criminal Cases* (1979) 67 Geo.L.J. 1075, 1077 (hereafter *Tague*); Moore, *Conflicts of Interest in the Simultaneous Representation of Multiple Clients: A Proposed Solution to the Current Confusion and Controversy* (1982) 61 Texas L.Rev. 211, 274 (hereafter *Moore*).) While the most obvious conflicts arise when defendants have inconsistent defenses or where, as here, they have been offered inconsistent plea bargains, it is no exaggeration to suggest that virtually any difference in codefendants' demeanor, history, credibility, or culpability can trigger a

conflict at trial. (See *People* v. *Gallardo* (1969) 269 Cal.App.2d 86, 89 [74 Cal.Rptr. 572]; *People* v. *Odom* (1965) 236 Cal.App.2d 876, 878 [46 Cal.Rptr. 453].) ▆ "The potential for conflict of interest in representing multiple defendants is so grave that ordinarily a lawyer should decline to act for more than one of several co-defendants except in unusual situations when, after careful investigation, it is clear that no conflict is likely to develop and when the several defendants give an informed consent to such multiple representation." (ABA Standards, Defense Function (1974) std. 3.5(b), at p. 123.)

▆ When a conflict of interest arises in a case where the defendant has been required to accept joint representation over a timely objection, the United States Supreme Court has established a rule of per se reversal (*Holloway, supra,* 435 U.S. at p. 488 [55 L.Ed.2d at p. 436]); a rule requiring a showing of prejudice "would not be susceptible of intelligent, even-handed application." (*Id.* at p. 490 [55 L.Ed.2d at p. 438].) However, in *Cuyler* v. *Sullivan, supra,* 446 U.S. 335, the court determined that "[i]n order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." (446 U.S. at p. 348 [64 L.Ed.2d at p. 346], fn. omitted.) Still, "[t]he conflict itself demonstrate[s] a denial of the 'right to have the effective assistance of counsel.' [Citation.] . . . ▆▆▆▆▆ [A] defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." (*Id.,* at pp. 349-350 [64 L.Ed.2d at p. 347].)[16]

We have applied a somewhat more rigorous standard of review. ▆ In a line of cases beginning with *People* v. *Chacon, supra,* 69 Cal.2d 765, 776, footnote 3, and continuing through *People* v. *Cook* (1975) 13 Cal.3d at pages 663, 670 [119 Cal.Rptr. 500, 532 P.2d 148], certiorari denied

---

[16]The Supreme Court's distinction between "adverse effect" on representation and prejudice is not entirely clear. (See Note, *Conflicts of Interest in the Representation of Multiple Criminal Defendants: Clarifying Cuyler v. Sullivan* (1982) 70 Geo.L.J. 1527.) Some courts have required only that an actual conflict be shown and assume that the conflict has an adverse effect on representation. (See, e.g., *Commonwealth* v. *Michel* (1980) 381 Mass. 447 [409 N.E.2d 1293].) Others have undertaken a two-step inquiry, determining first whether a conflict exists, and second, whether that conflict affected the defendant's representation. (See, e.g., *Parker* v. *Parratt* (8th Cir. 1981) 662 F.2d 479, cert. den. (1982) 459 U.S. 846 [74 L.Ed.2d 91, 103 S.Ct. 102].) As a practical matter, the Supreme Court's formulation seems to envision an analysis of whether there has been some identifiable prejudice to the right of effective representation, but not an analysis of whether that prejudice affected the outcome of the case. "[T]he assistance of counsel is among those 'constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error.' *Chapman* v. *California* [(1967) 386 U.S. 18, 23 (17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065)]." (*Holloway* v. *Arkansas, supra,* 435 U.S. at p. 489 [55 L.Ed.2d at p. 437].)

(1975) 423 U.S. 870 [46 L.Ed.2d 100, 96 S.Ct. 135], and *Maxwell* v. *Superior Court* (1982) 30 Cal.3d 606, 612-613 [180 Cal.Rptr. 177, 639 P.2d 248, 18 A.L.R.4th 333], we have held—regardless of whether there was an objection—that even a potential conflict may require reversal if the record supports "an informed speculation" that appellant's right to effective representation was prejudicially affected. Proof of an "actual conflict" is not required. The same principles apply when counsel represents clients whose interests may be adverse even when they are not codefendants in the same trial. (*Uhl* v. *Municipal Court* (1974) 37 Cal.App.3d 526, 530-535 [112 Cal.Rptr. 478]; accord, *Leversen* v. *Superior Court* (1983) 34 Cal.3d 530 [194 Cal.Rptr. 448, 668 P.2d 755].)

■ This case runs afoul of *both* the California and federal standards, for the record discloses potential as well as actual conflicts. Indeed, this is "one of those rare instances where it is demonstrated on the record that the nature of the defense afforded deprived the defendant of a constitutional right." (*People* v. *Keesee* (1967) 250 Cal.App.2d 794, 798 [58 Cal.Rptr. 780].)

The apparent point of conflict is not that counsel acting only for Mroczko would have had a realistic chance of putting the blame on Brindle or, for that matter, Hall without inculpating Mroczko. From what we know, such a strategy would have been doomed to fail. What was very much in the cards, however, was the possibility of proving that Mroczko, instead of being the chief culprit, was, at worst, an accessory whose involvement was marginal and, to some extent, unwilling. Having in mind that Mroczko faced the death penalty only if convicted of first degree murder and that at the penalty phase almost any relatively favorable evidence could save his life, the conflicts that developed assume gigantic importance.

First and foremost is the fact that potentially there is stronger evidence of premeditation against Brindle than against Mroczko.

Only one witness, Jerry Daniels, suggested that Mroczko planned the murder beforehand. While the prosecution established a possible motive for Brindle to kill Love—he allegedly had information that could have delayed Brindle's parole—no comparably compelling motive for Mroczko's participation in the murder was ever suggested. On the other hand, a number of *prosecution* witnesses testified that after the murder Mroczko claimed it was "an accident" and that he "didn't mean to" kill Love.

An opportunity for counsel to exploit the lack of premeditation evidence at Brindle's expense arose when Daniels took the stand. As noted, before trial Daniels told a prosecution investigator that he had heard Mroczko state on the morning of the murder that he intended to "kick [Love's] ass," but

that Brindle wanted Love "taken out completely." Brindle was concerned that Love had information which could jeopardize his upcoming parole date. At trial, Daniels asserted that it was Brindle who wanted to "kick . . . ass" while Mroczko intended to kill Love. Obviously an attorney representing only Mroczko would have done everything possible to suggest that Daniels got it right the first time. Under the circumstances, however, all that counsel could do was to suggest to the jury that Daniels had a poor memory: "So, Mr. Daniels has got it all backwards. You can't decide who said what. Is Mroczko the bad guy? Is he the one saying, 'let's kill him'? Well, in court he says that. But to Mr. Moreno all Mr. Mroczko wanted to do was kick his ass and . . . it was Brindle that wanted to kill Love. He can't keep it straight." Since, as noted, Daniels was the only witness who suggested that Mroczko planned to murder Love in advance, counsel's failure to explore this weakness in Daniels' testimony cost Mroczko a valuable defense.[17]

Counsel was also precluded from asserting that Hall or Brindle, rather than Mroczko, actually strangled Love while Mroczko merely served as an accomplice. Only one witness, Garcia, claimed to have seen Mroczko strangle Love. However, Garcia contradicted himself on the stand. Initially, he stated: "[Love] was trying to get loose from Mr. Mroczko. And he was trying to shake away Mr. Brindle who had him by the throat with a rope or a wire." Moments later, Garcia changed his testimony, and described Mroczko as the one who had Love by the throat. On cross-examination, counsel made no attempt to cause Garcia to reverse himself once more and place chief blame on Brindle. Instead, he simply gave the witness a chance to repeat the version that made Mroczko more culpable.

Hall was an even more plausible chief culprit. As noted, Young had given a statement to a prosecution investigator suggesting that Hall, rather than Mroczko, committed the murder while Mroczko only watched and "urinated in his own pants." Some of the testimony at trial also suggested that Hall was the leader. Jerry Daniels, for example, testified that Hall participated in the early morning conference in which Brindle and Mroczko purportedly decided to kill Love or "kick his ass." Hall was "aggravated" during the

---

[17]Conversely, every time defense counsel emphasized that Brindle had a strong alibi, he drew attention to the weakness of Mroczko's alibi. At one point during the final argument, for example, Umhofer conceded that the defense had had difficulty establishing an alibi for Mroczko during the crucial period around noon. "We brought in Tom Mace to try and corroborate as much as we could about the people who had seen Richard at or around noontime." Only seconds later, counsel asserted: "The biggest problem the prosecution has is, of course, . . . dealing with Tom Brindle's situation . . ."—i.e. that he had a solid alibi corroborated by numerous witnesses. Umhofer elaborated: "Well, you might be able to accuse us of putting on some fairly intelligent, maybe slick people like Jim Elliott and Dennis Hall [both of whom testified on behalf of Mroczko], but you certainly can't accuse us of that when we put on Ray Warren [who corroborated Brindle's alibi], a very simple straight-forward guy . . . ."

conversation and stated: "He needs to be killed." Daniels also claimed that Hall, not Mroczko, was "stirring it up" and "wanted to see something happen."[18] In addition, during his own testimony, Hall claimed that he borrowed Mroczko's "dobermans"—the gloves—on the day of the murder, and was unable to offer a satisfactory explanation of how or when they were returned.[19]

Defense counsel made nothing of the evidence against Hall. He made no effort to introduce Young's statement either as a prior inconsistent statement of Hall after questioning Hall, or as a declaration against penal interest in the event that Hall took the Fifth Amendment. He did not question Daniels regarding Hall's comments during the morning meeting, or establish what Daniels meant when he said Hall was "stirring it up." He did not question Hall regarding the "dobermans." Instead he called Hall as a witness to give Mroczko a useless alibi.

While it is possible that counsel's decision not to pursue the Hall evidence was tactical—Hall provided Mroczko with as close to an alibi as he could muster—we cannot make that assumption since Umhofer also represented Hall. By discarding what appears to have been a very strong theory that could at least have mitigated Mroczko's role in the crime, in favor of less credible theories that purported to exonerate all of his clients—the alibi and the suicide theories—counsel papered over the conflict that would have arisen had he accused Hall directly. Yet, his very choice of strategies was colored by the conflict he faced; only by choosing strategies that vindicated all three of his clients could Umhofer appear to satisfy his obligation to each. His ability to serve as attorney for any one of his clients was therefore impaired.[20]

We recognize that even if Mroczko and Brindle had been represented by separate counsel, neither of whom also represented Young or Hall, such

---

[18]This fits well with the testimony of Tom Mace, a defense witness who claimed that he was not friendly with Hall because he was "too radical."

[19]Mroczko originally testified that he had lent his gloves to Hall on the day of the murder and that Hall returned them to him that night. While Hall verified that he had borrowed the gloves, he stated that he could not find Mroczko that evening and returned the gloves to a third person whose identity he could not recall. When Mroczko retook the stand he stated that he could not recall how his gloves were returned.

[20]That Mroczko suffered from this impairment is equally apparent. While the strategy may have suited Brindle, who had a strong alibi defense, and Hall, who was not charged, Mroczko had virtually no defense other than to claim that he did not commit the murder. To do this, he was forced to assert that all six prosecution inmate witnesses were lying—an unlikely prospect. A much more plausible defense would therefore have been to inculpate Hall as the principal.

There is some independent evidence which suggests that the jury may well have been sympathetic to this line of argument. During its deliberations, the jury submitted several questions indicating that they suspected Hall may have had a part in the murder.

counsel might have made precisely the same tactical decisions as Umhofer, cross-examined or failed to cross-examine in the same way, called or failed to call the same witnesses and argued to the jury in identical fashion. The point is, of course, that if that had happened, it would have happened because each attorney decided that it should, thinking only of his own client's interests and not those of another defendant and two other clients.

Finally, there is the matter of the plea bargains. As noted, two plea bargains were offered. The first, under which Brindle would have been permitted to plead guilty to having been an accessory after the fact in exchange for his testimony against Mroczko, obviously placed counsel in an untenable position.[21] Brindle rejected the offer so Mroczko could only have been harmed by the conflict in that, in hindsight, he might have fared better if Brindle had testified and had implicated Hall as well as Mroczko in the crime. But the second offer—a "package" bargain permitting Mroczko to plead guilty to second degree murder if Brindle pleaded guilty to having been an accessory after the fact—posed a conflict that could have affected either defendant. While we can only speculate what would have happened if the two defendants had been separately represented, it is clear that under the circumstances the only chance the offer had of being accepted was that it appealed equally to both clients; but if, for example, Mroczko wanted to snap it up but Brindle was reluctant, counsel was in no position to lean on one client on behalf of the other.[22] As matters turned out, each defendant would have benefited by some friendly persuasion on behalf of the other.

These are only some of the outward manifestations of the conflict faced by defense counsel. "'[I]nnumerable intangible factors' . . . may always lurk in the wings when there is a disparity of involvement between codefendants." (*People* v. *Gallardo, supra,* 269 Cal.App.2d at p. 90, quoting *People* v. *Kerfoot* (1960) 184 Cal.App.2d 622, 637 [7 Cal.Rptr. 674].) While, to his credit, counsel refrained from calling attention to the differences in testimony against each of his clients, his almost total failure or inability to cross-examine prosecution witnesses regarding the relative role

---

[21]The Court of Appeal's pretrial decision focused on this offer, correctly noting that "The public defender cannot ethically advise [Brindle] to accept the offer or otherwise advise him in any manner which might encourage a decision to accept the offer—to do so would be directly adverse to the interests of [Mroczko]. Conversely, counsel necessarily acts against the interests of [Brindle] if he advises rejection of an offer which should be accepted." (*People* v. *Superior Court (Mroczko), supra,* 94 Cal.App.3d 626, 629.)

[22]Mroczko had significantly greater incentives to accept the offer than Brindle: He was on trial for his life; Brindle was not. Mroczko had a number of years remaining on his previous sentence; Brindle was to have been released just after the date of the murder. Six prosecution witnesses connected Mroczko with the crime and suggested that he was the principal; only three witnesses incriminated Brindle, and all suggested he was the accomplice. Brindle had a strong alibi, Mroczko's was full of holes.

of each of his clients was equally harmful. ■ As the United States Supreme Court noted in *Holloway*: "[I]n a case of joint representation of conflicting interests the evil—it bears repeating—is in what the advocate finds himself compelled to *refrain* from doing . . . ." (Italics in original, 435 U.S. at p. 490 [55 L.Ed.2d at p. 438]; see *Geer, supra*, 62 Minn.L.Rev., at pp. 131-132; *Craig* v. *United States* (6th Cir. 1954) 217 F.2d 355 [holding that cross-examination that fails to highlight differences among multiple defendants manifests constitutionally impermissible conflicts of interest]; but see *People* v. *Keesee, supra*, 250 Cal.App.2d 794, 795-796 [final argument pointing out differences in evidence against codefendants reveals conflict].)[23] The jury might well have convicted Mroczko of a lesser offense or chosen not to give him the death penalty, had counsel been free to shift blame or argue mitigating circumstances. His concurrent representation of Hall, Brindle and Mroczko precluded this course.[24]

## IV

■ "When a trial court undertakes to appoint counsel for indigent codefendants [citation], it must assume the burden of assuring that its appointment does not result in a denial of effective counsel because of some possible conflict." (*People* v. *Cook, supra*, 13 Cal.3d at p. 671.)[25] ■ While the right to conflict-free counsel may generally be waived (*Cuyler* v. *Sullivan, supra*, 446 U.S. at pp. 346-347 [64 L.Ed.2d at pp. 345-346]; *Holloway* v. *Arkansas, supra*, 435 U.S. at p. 483, fn. 5 [55 L.Ed.2d at p. 433];

---

[23]Perhaps the most severe problem posed by joint representation, at least from the standpoint of an appellate court, is that it is usually impossible to determine on appeal whether a defendant has received adequate representation. As the court in *Lollar* v. *United States* (D.C. Cir. 1967) 376 F.2d 243, 246, noted, manifestations of conflict stemming from multiple representation are likely to be only the "tip of the iceberg." Actually, the iceberg metaphor amounts to an understatement: "While it is a law of physics that a certain portion of a floating ice mass appears above the surface, it is quite possible for an appellate record to fail to show any indication of a conflict, although in fact one exists. The very vice of joint representation lies in the possibility that the conflict gets swept under the rug." (*People* v. *Baker* (1968) 268 Cal.App.2d 254, 256, fn. 2 [73 Cal.Rptr. 758].)

[24]Even during the penalty phase, when Brindle was no longer involved in the case, counsel was precluded from shifting the blame to Brindle. Obviously, one of defense counsel's most important goals is to gain the trust of the jury. To argue on behalf of Brindle at one point in the trial and turn against him in another part of the same trial would suggest to the jury that counsel did not sincerely believe in his own positions.

[25]In *Glasser* v. *United States, supra*, 315 U.S. at page 70 [86 L.Ed. at pp. 699-700], the Supreme Court explained: "Upon the trial judge rests the duty of seeing that the trial is conducted with solicitude for the essential rights of the accused. . . . The trial court should protect the right of an accused to have the assistance of counsel. 'This protecting duty imposes the serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused. While an accused may waive the right to counsel, whether there is a proper waiver should be clearly determined by the trial court, and it would be fitting and appropriate for that determination to appear upon the record.' *Johnson* v. *Zerbst* [(1938)] 304 U.S. 458, 465."

*Glasser* v. *United States, supra,* 315 U.S. at p. 70 [86 L.Ed. at p. 699]; *Maxwell* v. *Superior Court, supra,* 30 Cal.3d at p. 619, fn. 11),[26] waivers of constitutional rights must, of course, be "knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." (*Brady* v. *United States* (1970) 397 U.S. 742, 748 [25 L.Ed.2d 747, 756, 90 S.Ct. 1463], fn. omitted.) No particular form of inquiry is required, but, at a minimum, the trial court must assure itself that (1) the defendant has discussed the potential drawbacks of joint representation with his attorney, or if he wishes, outside counsel, (2) that he has been made aware of the dangers and possible consequences of joint representation in his case, (3) that he knows of his right to conflict-free representation, and (4) that he voluntarily wishes to waive that right. (See generally *United States* v. *Foster* (1st Cir. 1972) 469 F.2d 1, 5; *United States* v. *Dolan, supra,* 570 F.2d 1177, 1181-1183; *United States* v. *Garcia, supra,* 517 F.2d 272, 277-278; *United States* v. *Lawriw* (8th Cir. 1977) 568 F.2d 98, 104, cert. den. (1978) 435 U.S. 969 [56 L.Ed.2d 60, 98 S.Ct. 1607]; *United States* v. *Curcio, supra,* 680 F.2d 881, 888-889.) Any waiver must be unambiguous and "without strings." (*Dolan, supra,* at p. 1181, fn. 7; *United States* v. *Bernstein* (2d Cir. 1976) 533 F.2d 775, 788, cert. den. (1976) 429 U.S. 998 [50 L.Ed.2d 608, 97 S.Ct. 523].) ▇ We indulge every reasonable presumption against the waiver of unimpaired assistance of counsel. (*Glasser, supra,* at p. 70 [86 L.Ed. at p. 699].)

▇ The attempted waivers here were fatally flawed in several respects. First, the courts' comments did not fully convey a number of actual

---

[26]The issue of when—or if—a trial court may disqualify joint counsel despite codefendants' expressed desires to continue with single counsel is a subject of much controversy in the federal courts and has yet to be considered directly by this court. In *Maxwell* v. *Superior Court,* we noted that although "the mere possibility of a conflict does not warrant pretrial removal of competent counsel in a criminal case over defendant's informed objection," (*id.* at p. 619) "[w]e do not deprive the trial court of power to act when an actual conflict materializes during the proceedings, producing an obviously deficient performance. Then the court's power and duty to insure fairness and preserve the credibility of its judgments extends to recusal even when an informed defendant, for whatever reason, is cooperating in counsel's tactics." (Citations, *id.* at p. 619, fn. 10.) A number of federal courts have held that purported waivers may be rejected when actual conflicts are likely to arise whether counsel is appointed or retained. (E.g., *United States* v. *Dolan* (3d Cir. 1978) 570 F.2d 1177; *United States* v. *Flanagan* (3d Cir. 1982) 679 F.2d 1072, cert. granted (1983) 459 U.S. 1101 [74 L.Ed.2d 948, 103 S.Ct. 721]; *United States* v. *Vargas-Martinez* (9th Cir. 1978) 569 F.2d 1102; *United States* v. *Helton* (S.D.N.Y. 1979) 471 F.Supp. 397.) Recently enacted Federal Rules of Criminal Procedure, rule 44(c) is apparently in accord with this line of cases, and the advisory committee notes cite *Dolan* extensively. (See Advisory Com. notes, 77 F.R.D. 507, 602-603.) However, other federal courts have held that when counsel is retained, courts may not interfere with defendants' choice of counsel if a knowing and intelligent waiver can be obtained. (E.g., *United States* v. *Curcio* (2d Cir. 1982) 680 F.2d 881, 886-888; *United States* v. *Garcia* (5th Cir. 1975) 517 F.2d 272, 277; *United States* v. *Armedo-Sarmiento* (2d Cir. 1975) 524 F.2d 591, 592.)

and severe conflicts that were apparent even pretrial. Instead, each judge who addressed the defendants concerning the conflicts did so in language implying that they were merely potential conflicts. Most importantly, however, defense counsel reinforced this notion by repeatedly—and erroneously—asserting that no conflict existed. The product of the courts' and counsel's approaches was apparent in Mroczko's responses: he was not convinced that a conflict would arise. Mroczko's final comment, that he was aware of the possibility of a conflict but did not "believe it," should have alerted the trial court to the fact that he may not have understood the severity of the problem. (Cf. *United States* v. *Bernstein, supra,* 533 F.2d 775.)

The manner in which the trial court undertook its inquiries is also troubling. During the April 9 session, the fullest discussion of the conflict issue, the court allowed the prosecutor to formulate and explain the nature of the conflicts as part of his argument that defense counsel should have been disqualified because the conflict was "unwaivable." Refusing to disqualify defense counsel, the court simply paraphrased each of the prosecution's assertions as they were made, and then asked each of the defendants whether he understood the objection and was willing to waive the potential conflict. The very fact that the prosecution instead of the court was urging the defendants to accept separate counsel may have contributed to the defendants' stubborn insistence on joint counsel. Undoubtedly, the prosecution's efforts were perceived by the defendants as an attempt to drive a wedge between them in the hope that they would testify against each other.[27]

Ultimately, however, it was defense counsel's pervasive influence on the proceedings that convinces us that Mroczko did not adequately waive his right to effective counsel. ▆▆ ▆▆ ▆▆ ▆▆ ▆▆ When a trial court "knows or reasonably should know that a particular conflict exists," it must inquire of defendants to obtain a valid waiver. (*Cuyler* v. *Sullivan, supra,* 446 U.S. at p. 347 [64 L.Ed.2d at p. 346].)[28] ▆▆ Failure to make such

---

[27]At one point the prosecutor announced in exasperation: "I don't think these waivers are valid."

[28]Numerous federal courts have established rules requiring inquiry whenever there is joint representation whether or not a conflict has come to the court's attention. Federal Rules of Criminal Procedure, rule 44(c) adopts this approach: "Whenever two or more defendants have been jointly charged . . . or have been joined for trial . . . and are represented by the same retained or assigned counsel or by . . . counsel who are associated in the practice of law, the court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of his right to the effective assistance of counsel, including separate representation. Unless it appears that there is good cause to believe that no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant's right to counsel." A similar obligation applies in California. (*People* v. *Chacon, supra,* at p. 774; *People* v. *Elston* (1982) 130 Cal.App.3d 721, 728-729 [182 Cal.Rptr. 30]; *People* v. *Angulo* (1978) 85 Cal.App.3d 514, 518-519 [148 Cal.Rptr. 517].)

an inquiry when there is a *"possibility* of a conflict," (*Wood* v. *Georgia* (1981) 450 U.S. 261, 272 [67 L.Ed.2d 220, 230, 101 S.Ct. 1097]) *"man-dates* a reversal . . . ." (*Id.* at p. 272, fn. 18 [67 L.Ed.2d at p. 231], italics in original.) This inquiry is to be made directly of defendants to assure that they have been adequately apprised of the nature and consequences of any conflicts faced by counsel. (*Campbell* v. *United States* (D.C. Cir. 1965) 352 F.2d 359, 360-361; *United States* v. *DeBerry* (2d Cir. 1973) 487 F.2d 448, 453; Hyman, *Joint Representation of Multiple Defendants in a Criminal Trial: The Court's Headache* (1977) 5 Hofstra L.Rev. 315, 333-334 (here-after *Hyman*); but see *People* v. *Gomberg* (1975) 38 N.Y.2d 307 [379 N.Y.S.2d 769, 342 N.E.2d 550].) ■■ "While attorneys are often in a position to waive many important rights of their clients, they do so presumably based upon a judgment made solely in the best interests of that client. When a conflict of interest is involved, however, that judgment is impaired because of conflicting loyalties and commitments. An attorney who is burdened with a conflict of interest cannot, by the very nature of the problem, be giving the client '[t]he professional judgment of a lawyer . . . solely for the benefit of his client and free of compromising influences and loyalties.' [Fn. omitted.]" (*Hyman, supra,* at p. 334.) Even when an attorney has made a serious effort to explain the potential impact of conflicts to his client, "it is not enough to rely upon counsel, who may not be totally disinterested, to make sure that each of his joint clients has made an effective waiver." (*United States* v. *Lawriw, supra,* 568 F.2d at p. 104.)

■■ An attorney who seeks to continue as conflicted counsel has an obligation to alert the court to the existence of a conflict. (*Holloway* v. *Arkansas, supra,* 435 U.S. at pp. 485-486 [55 L.Ed.2d at pp. 435-436]; accord, *Cuyler* v. *Sullivan, supra,* 446 U.S. at p. 346 [64 L.Ed.2d at p. 345].) Since defense counsel is likely to be the only person aware of a conflict, his cooperation is essential to assure that a proper inquiry is made. "An 'attorney representing two defendants in a criminal matter is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial.' [Citation.] ■■ . . . [A]ttorneys are officers of the court, and ' "when they address the judge solemnly upon a matter before the court, their declarations are virtually made under oath." ' " (*Holloway* v. *Arkansas, supra,* at pp. 485-486, citation omitted.) ■■ When an attorney addresses the court regarding a potential or actual conflict, he is obligated to do so forthrightly and honestly. He may not interfere with the court's attempts to inquire of the defendants, and must assist the court by bringing potential and actual conflicts to its attention.[29]

---

[29]As discussed in the next section, this may pose a difficult dilemma for counsel, who must also concern himself with protecting his clients' Fifth Amendment rights.

 Defense counsel's conduct here falls far short of this standard. Instead of facilitating the trial court's attempts to explore the conflicts and to obtain a valid waiver, counsel did everything in his power to prevent a penetrating inquiry. In the face of serious conflicts, he made no attempt to inform the court. On the contrary, he took the indefensible position that no conflicts existed. Instead of conceding that Young's statement to Moreno created a conflict with Hall, counsel erroneously asserted that Young's statement would be "irrelevant and inadmissible," and that, since Young might not be called by either side, any conflict was "speculative."[30]

Counsel not only refused to admit to the conflicts that the prosecution had unearthed, but actively prevented the court and the prosecution from discovering others—particularly those between Brindle and Mroczko. As noted, separate counsel was appointed for Brindle at the arraignment, but Umhofer, citing financial concerns, successfully moved to have separate counsel dismissed. Later, when the court attempted to offer the defendants separate counsel to advise them on the joint representation and plea bargain issues, Umhofer again interceded, arguing that such an arrangement would jeopardize his clients' rights and that any new counsel brought in at that stage would be unable to familiarize himself in the time remaining before trial.

By interjecting himself into the court's questioning—or perhaps we should say the prosecution's questioning—Umhofer prevented the court from ascertaining whether the defendants fully understood the nature and probable consequences of the serious conflicts that were present, even pretrial. Moreover, his behavior strongly suggests that he was unwilling or unable to assess accurately whether his representation of Hall, Brindle and Mroczko was in the best interest of each. The very fact that he was willing to represent such clearly conflicting interests despite the ethical and legal ramifications of his position, raises questions about his judgment, or at least his impartiality.

Having determined that the inquiry undertaken by the trial court was, in essence, blocked by defense counsel's tactics, we must conclude that the conflicts were not knowingly and intelligently waived. Since they prejudicially affected Mroczko's representation, the judgment must be reversed.

In reaching this conclusion, we are fully aware that the prosecution did virtually everything in its power to bring this conflict to the attention of the

---

[30]In addition to being inaccurate, this statement missed the point: the importance of the conflict was not just that it would prevent counsel from conducting an effective examination of Young at trial, but that it affected counsel's decision whether to make use of the Young statement at all.

court. It failed through no fault of its own but because defense counsel held all the cards and refused to provide the prosecution or the court with sufficient information. "There are . . . occasions when an injustice of constitutional magnitude occurs despite what appear at the time to be the best efforts of experienced and competent judicial and prosecutorial personnel." (*United States* v. *Gaines* (7th Cir. 1976) 529 F.2d 1038, 1045.)

## V

Persons accused of crime are unlikely to understand the potential risks involved in joint representation. (*Geer, supra,* 62 Minn.L.Rev. at p. 154; *Moore, supra,* 61 Texas L.Rev. at pp. 277-278; *Tague, supra,* 67 Geo.L.J. at pp. 1102-1103.) "However parallel [a defendant's] interests may seem to be with those of a co-defendant the course of events in the prosecution of the case, the taking of a guilty plea, or the conduct of the trial may radically change the situation so as to impair the ability of counsel to represent the defendant most effectively." (*United States* v. *Carrigan* (2d Cir. 1976) 543 F.2d 1053, 1058, Lumbard, J., conc.) Presented by the court with conflict-ridden counsel, where should a defendant turn for advice? The attorney who faces the conflict may be incapable of giving unbiased advice. On the other hand, inquiry by the trial court is an inadequate substitute. Even if counsel is willing to admit that conflicts exist, he may be unwilling or ethically unable to give the court any specific information about them, fearing that his clients' interests will be prejudiced. The court, concerned with protecting the record, can describe any conflicts that have come to its attention in a general way and question the defendants, but the scope of its knowledge and inquiry will be sharply limited by the defendants' Fifth Amendment rights. (*Maxwell* v. *Superior Court, supra,* 30 Cal.3d at p. 621; *Cook, supra,* 13 Cal.3d at p. 672, fn. 7; *Holloway, supra,* 435 U.S. at p. 487, fn. 11 [55 L.Ed.2d at p. 436].) The dilemma is well summarized by a federal trial judge faced with the problem of obtaining a knowing and intelligent waiver of conflicts due to multiple representation: "[T]he trial judge cannot conduct a meaningful inquiry. He does not know the case. He cannot know the facts or the inferences which may be fairly drawn from them. He is unaware of the quality of the witnesses and the trial strategy the government and the defendants will pursue. Nor can he inquire into the defense without violating defendant's Fifth and Sixth Amendment rights; and this is so whether the interrogation is held in open court or *in camera.* He is restricted to imparting vaguely contoured, abstract advice on a doctrine as to which the lawyer then and there present has undoubtedly already advised his clients. Indeed, the attorney's words will have more meaning to the defendants because they are not empty abstractions but related to the facts of the case. He has already told his clients that there is no conflict in their interests. Thus, when the defendants answer the court's inquiry, they

actually are relying upon the advice received from their lawyer. If he tells them there is no conflict and that he can effectively represent them, how can their responses to the court be deemed to amount to a *Johnson* v. *Zerbst* waiver of their sixth amendment right to effective aid of counsel? Cf. *Fay* v. *Noia,* 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963)." (*United States* v. *Garafola* (D.N.J. 1977) 428 F.Supp. 620, 624, affd. *United States* v. *Dolan, supra,* 570 F.2d 1177.) Many commentators agree that seemingly "knowing and intelligent" waivers of joint representation conflicts are frequently neither. (*Geer, supra,* 62 Minn.L.Rev. 119, at p. 154; *Moore, supra,* 61 Texas L.Rev. 211, at p. 277; *Lowenthal, supra,* 64 Va.L.Rev. 939, at pp. 971-972; *Tague, supra,* 67 Geo.L.J. 1075, at pp. 1102-1103; *Developments in the Law: Conflicts of Interest in the Legal Profession* (1981) 94 Harv.L.Rev. 1244, 1395.)[31]

■ In hopes of solving this problem, we adopt as a judicially declared rule of criminal procedure the rule of the United States Court of Appeals, District of Columbia Circuit, requiring that when the court undertakes to appoint counsel, it must initially select separate and independent counsel for each defendant "with an instruction that if counsel conclude, after fully investigating the case and consulting with their clients, that the interests of justice and of the clients will best be served by joint representation, this conclusion with supporting reasons shall be communicated to the court for such on-the-record disposition as the court deems appropriate in the circumstances." (*Ford* v. *United States* (D.C.Cir. 1967) 379 F.2d 123, 126. See also *Martin* v. *State* (1974) 262 Ind. 232 [314 N.E.2d 60, 66-67, fn. 3], cert. den. (1975) 420 U.S. 911 [42 L.Ed.2d 841, 95 S.Ct. 833].)[32]

Separate counsel will assure that each defendant's interests are as fully protected as possible. If, after discussing the case with their own counsel,

---

[31]Professor Lowenthal's comments are typical: "Although the 'affirmative inquiry' approach removes from the reviewing court the burden of recognizing and assessing conflicts of interest, it does not solve the conflict of interest problems that occur in joint representation. The fifth amendment privilege against self-incrimination limits the court's inquiry into the defendants' versions of the facts of the case, and the court may not inquire too far into defense strategy without running afoul of the attorney-client privilege. Without the benefit of detailed statements from the defendants, a trial judge cannot assess accurately the risk of a conflict of interest at the commencement of a criminal action. It is also unrealistic to assume that a trial judge, from only a brief inquiry, can identify significant differences in the respective backgrounds of the defendants that might affect counsel's ability to represent them, when a probation officer normally must spend several weeks in gathering such information for a presentence investigation report. Thus any statement that a trial judge may make to the defendants concerning the 'risks' of joint representation necessarily will be superficial." (*Lowenthal, supra,* 64 Va.L.Rev., at pp. 981-982.)

[32]Of course, experience cautions that every rule must have its qualifications and we assume that the one we have just announced is no exception. One can readily visualize situations in which rigid adherence to the "one defendant—one lawyer" principle would paralyze the system. Decisions on where the line should be drawn must, however, await the emergence of actual situations which call for appropriate limitations or modifications of the rule.

the defendants still seek joint counsel, they will at least have received a detailed and unbiased assessment of the pros and cons. Only after each defendant is fully informed by counsel who is not hobbled by a conflict can a court be assured that a word-perfect waiver is truly knowing and intelligent.[33]

Judgment reversed.

Bird, C. J., Mosk, J., Richardson, J., Broussard, J., Reynoso, J., and Grodin, J., concurred.

---

[33]As a practical matter, few defendants are likely to choose joint representation once they have been made aware of its pitfalls. Professor Tague notes that his research revealed no instances in the District of Columbia Circuit of defendants who asked to be represented by a single attorney after separate counsel was appointed, and no cases where joint representation issues have been raised by a defendant on appeal after *Ford*. (*Tague, supra,* 67 Geo.L.J. at pp. 1116-1117.) While the *Ford* rule may entail some additional expenditures by state and county governments, it may lead to savings as well. As this case amply demonstrates, obtaining a valid waiver in the joint representation context is a lengthy process which does not fully insulate the judgment from appellate review. "[I]t seems to be a rare appeal in a criminal case where two defendants are jointly tried and represented by one attorney, that the question of separate representation does not become an issue." (*People* v. *Baker, supra,* 268 Cal.App.2d at p. 260.) In addition to providing better representation for indigent defendants, the rule we adopt today should eliminate the useless expenditure of judicial resources to sort out conflicts both at trial and on appeal. For a full discussion of the advantages of the *Ford* rule see *Tague, supra,* 67 Geo.L.J. at pages 1122-1130.