Filed 9/29/20  Shalikar v. Active Mobility Center CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| MOHTASHAM SHALIKAR, as Trustee, etc. et al., Plaintiffs and Appellants, v. ACTIVE MOBILITY CENTER, INC. et al., Defendants and Respondents. | E070363 (Super.Ct.No. RIC1502665) OPINION |

APPEAL from the Superior Court of Riverside County.  Daniel A. Ottolia, Judge. Affirmed.

The Yarnall Firm and Delores A. Yarnall; Mohtasham Shalikar and Maria Shalikar, Plaintiffs and Appellants in pro. per.

Shane, Digiuseppe & Rodgers and Richard A. Rodgers for Plaintiffs and Appellants.

Law Offices of Stephen A. Lindsley and Stephen A. Lindsley for Defendants and Respondents.

1

Plaintiff Mohtasham Shalikar sued his brother, Mohammad Shalikar, alleging the breach of a written lease and guarantee. Mohammad conceded that his signature on the alleged contract appeared genuine, but he denied ever seeing it or signing it. After a full bench trial — including conflicting expert testimony on the central issue of whether the signature had been cut and pasted onto the document — the trial court entered judgment for Mohammad; it ruled that Mohtasham had not met his burden of proving that the alleged contract ever existed.

Mohtasham then filed a motion for new trial. He claimed to have new evidence that Mohammad prevented his daughter, Freshta, from testifying, and that Mohammad testified falsely at trial. The trial court denied the motion. It explained that the assertedly new evidence was not material: "The bottom line is the Court found that [Mohammad] did not sign the lease, and that is the quintessential finding of this Court."

Mohtasham appeals. We will affirm. The trial court duly considered the proffered evidence, and it could properly conclude that that evidence would not change its verdict.

I

FACTUAL BACKGROUND

A. *The Purchase of the New Property*.

Mohammad owned and operated a medical supply business called Active Mobility Center, Inc. (Active). His daughter Freshta worked for Active as its bookkeeper. She kept the accounting records, using QuickBooks. His son Habib also worked for Active.

2

Although Mohtasham was not an employee of Active, he helped out with it. He trained Freshta in using QuickBooks.

Originally, Active was located in a building that Mohammad owned on Seventh Street in Victorville (Old Property). Around 2010, Mohammad became interested in buying another piece of commercial real property, also on Seventh Street in Victorville (New Property). It was vacant; it had been on the market for approximately two years.

The offering price was $1.7 million. After a year of negotiations, Mohammad managed to get it down to $550,000. However, he still did not have enough money to buy it, so he asked Mohtasham "if he want[ed] to go half and half." Mohtasham agreed. The brothers also agreed that Active would move to the New Property.

In April 2011, the sale of the New Property closed. Mohtasham and his wife, as trustees of their family trust, took title to half; Mohammad and his wife took title to the other half.

The brothers spent three or four months remodeling the New Property, to "make it more retail friendly." Active paid for most of the remodeling.

Meanwhile, Mohtasham found "irregularities" in Active's accounting records. He suggested "start[ing] fresh" by creating a wholly new entity. Accordingly, sometime after May 2011, Freshta created a new entity called Health & Mobility (Health) by filing a fictitious business name statement in her name. Later, in September 2011, Mohammad put Health in his own name.

As we will discuss in more detail below, Mohtasham claimed that Active moved to the New Property immediately. Mohammad, however, claimed that Health moved there first, followed by Active several months later. A disproportionate amount of the trial was devoted to this issue. It was relevant only because the alleged lease, dated May 2011, was with Active; if as of that date the brothers intended Health, rather than Active, to move to the New Property, that would be some evidence of forgery.

It was undisputed that Active never paid rent to Mohtasham.[1] It was also undisputed that, between 2011 and 2015, Mohtasham never demanded rent.

The brothers made efforts to sell the New Property, but there were no buyers. Sometime between 2013 and 2015,[2] they received an offer to rent the property on a month-to-month basis. Mohammad wanted to accept, but Mohtasham refused.

---

[1] Another large chunk of trial time was devoted to the question of whether Active paid rent to *Mohammad* for the New Property. He testified that it did not. He was impeached somewhat by the books and records of Active, which showed that it paid rent in 2012 and 2013, although not in 2014 and 2015. Mohammad insinuated that the books and records were unreliable, because Mohtasham had fabricated entries.

We view this as a tempest in a teapot. Mohammad paid himself rent at the Old Location. He had a half interest in the New Location; there was nothing wrong with him paying himself rent there, too. Active's accountant testified that it did not really matter, because the money was taxable to Mohammad in any event. Such payments would shed no light on whether he had agreed to pay rent to Mohtasham.

[2] The posttrial litigation included a heated dispute over this date. (See part III, *post*.)

4

B.  *The Demand Letter*.

In March 2015, Mohtasham's attorney sent Mohammad a demand letter.  It claimed that Mohammad and Active owed $222,600 in back rent.  Mohammad wrote back, denying that there was any agreement for Active to lease the New Property, and asking Mohtasham to produce a copy of any such agreement.

Mohtasham eventually produced a two-page document dated May 1, 2011 (Agreement).  It combined a lease and a personal guarantee.  In the lease portion, Active leased the New Property from September 2011 through August 2015, for $5,000 a month; May 1 through August 31, 2011 was to be a tenant improvement period.  In the guarantee portion, Mohammad guaranteed the payment of rent under the lease.  The Agreement appeared to be signed by Mohammad.

C.  *Mohtasham's Side of the Story*.

According to Mohtasham, he bought the New Property at Mohammad's request, so Active could move there.  The Old Property was "not in a good area"; it had a problem with vandalism.  The brothers orally agreed that Active would pay Mohtasham rent for the New Property — $10,000 a month, of which $5,000 would go to the Trust and $5,000 would go to Mohammad.  They also agreed that Mohammad would personally guarantee the rent.

Mohammad drafted the Agreement.  Mohtasham and Mohammad both signed the Agreement, in each other's presence, on or about May 1, 2011.  Mohammad kept the original and gave Mohtasham a copy.  Mohtasham took his copy home and put it in a

5

binder.  (He kept separate binders for separate transactions.)  That copy was "somehow lost."  Mohtasham had faxed it to an attorney, who later faxed it back to him; that third-generation copy was what he produced in discovery.

Active started moving into the New Property in May 2011 and had largely finished the move by September 2011.  In September 2011, Health got a business license listing the New Property address, but all the business was done by Active; Health was like "a dead body."

In discovery, Mohammad was asked to identify each person who was allowed to occupy the New Property since May 1, 2011.  He responded that Active had occupied the New Property "since in or about 2011."

Active's accountant  testified that he visited Active at the New Property sometime before March 15, 2012.

Before sending the demand letter, Mohtasham made no demand that Mohammad pay back rent.  He explained that he forbore because he knew Mohammad was short of money.  Between 2007 and 2014, Mohammad borrowed close to $1.3 million from Mohtasham.

D.    *Mohammad's Side of the Story*.

According to Mohammad, when the brothers bought the New Property, they intended to "flip" it — i.e., to fix it up and resell it.  Mohtasham wanted Active to move

there to prevent vandalism and to make it more appealing to buyers, and Mohammad agreed. They never discussed the subject of Active paying rent.[3]

After escrow closed, Mohtasham came up with the idea of creating Health. The brothers then agreed that Health — not Active — would move to the New Property.

According to Mohammad, Health opened up at the New Property around August 2011. It was undisputed that Health put up signage at the New Property in February 2012.

Meanwhile, Active continued to operate at the Old Property. Mohammad testified that business at the Old Property was "very good." He admitted, however, that in March 2011, he had said that Active "was having financial problems." This referred to the fact that a former employee had just stolen "a lot of cash" from Active.

Vendor invoices showed that Active made purchases in 2011 that were delivered to or installed in the New Location. Mohammad explained, however, that Active was paying Health's expenses, because Health had no money.

It turned out, however, that "[i]t just didn't make sense" to have two similar businesses operating within a mile of each other. Also, Health was having trouble getting necessary licenses, such as from Medicare and Medi-Cal. Thus, the brothers decided to move Active to the New Location and to merge Health into it

---

**3** In his response to Mohtasham's demand letter, however, Mohammad said they had agreed that no rent would be due *until the Old Property was sold or leased*.

7

Active moved to the New Property in either May or July 2012.  It lost customers as a result.

Mohammad denied ever seeing, much less signing the Agreement.  The first time he ever saw it was as an attachment to the complaint.

He cited three indications that the Agreement was not genuine.

First, the Agreement was a simple two-page document.  Mohammad was a qualified real estate agent.  He had done 50 or 60 previous real estate transactions.  He had prepared leases in the past, usually using a standard commercial lease form.

Second, it would make no sense for Active to leave a building that it was using rent-free to move into a building where it would have to pay rent.

Third, the Agreement specified, "No automatic renewal."  In Mohammad's experience, commercial leases always provide for an option to renew.  He would never have agreed that Mohtasham "could kick [him] out" in just four years.[4]

---

[4]  Mohammad actually cited two additional indications, but they seem less than compelling.

He cited the fact that the Agreement listed the address of the New Location as Inner Seventh Street, even though it was actually on Outer Seventh Street.  Mohtasham testified, however, that he knew the correct address — as it seems likely he would.

Mohammad also noted that the Agreement identified the New Property by three street addresses.  He claimed that it consisted of just two parcels.  However, the escrow closing statement, which both brothers presumably received, listed all three addresses.  Mohtasham explained that the New Property consisted of two *parcels*, with three *addresses*.

8

E.    *Expert Testimony*.

Mohammad called Michael Wakshull, a forensic documents examiner. Wakshull testified that, in his opinion, Mohammad probably did not physically sign the Agreement; rather, his signature was placed on it electronically. He explained that there was a gap in the signature line where the first letter of the signature went across it. The only possible explanation for this gap was that the signature had been cut and pasted onto the document using software. In the "cut" step of this process, a little bit of white space had been cut and pasted along with the signature.

Wakshull admitted that there were also gaps in copies of certain checks that Mohammad had signed, but he explained that this was because banks scan checks at a "very, very low resolution." As a result, the checks had multiple gaps and "trash marks," all over each check. The Agreement, however, had only the one gap.

The Trust called Manuel Gonzales, also a forensic documents examiner. He had no opinion as to whether the Agreement had been altered. In his opinion, however, it was impossible to say definitively that a signature had been cut and pasted unless you could "locate[] and superimpose[]" the source signature; the existence of a gap was not a recognized indicator of cut-and-pasting. A gap could be caused by photocopying.

F.    *The Other Action*.

The following additional facts were shown in connection with posttrial motions.

In 2015, Mohtasham sued Mohammad and his wife, asserting numerous causes of action, including a cause of action for rent for the New Property on a quantum meruit

9

theory. (*Shalikar v. Shalikar*, Case No. RIC1514603 [Other Action].) After the trial in this case, both Mohammad and Freshta were deposed in the Other Action. In August through October 2017, the Other Action was tried to the court, before Judge Gloria Connor Trask. In November 2017, Judge Trask entered judgment, in which she denied Mohtasham's quantum meruit claim.

II

PROCEDURAL BACKGROUND

In 2015, Mohtasham and his wife Maria Shalikar, as trustees of their family trust, filed this action against Mohammad and Active. They asserted a cause of action for breach of written contract against Active and a cause of action for breach of written guarantee against Mohammad.[5]

In November 2016, the case was tried to the court.

In March 2017, the trial court issued a proposed statement of decision, ruling for Mohammad. Mohtasham filed objections to the proposed statement of decision. After hearing extensive argument, the trial court overruled all but one of these objections. In December 2017, it issued a final statement of decision, still ruling for Mohammad.

The trial court found that "defendant Mohammad's version of the facts is more credible than plaintiff's," for three reasons.

---

[5]     Because Maria's interests were aligned with Mohtasham's, and Active's interests were aligned with Mohammad's, we will disregard their status as separate parties. Thus, references to Mohtasham, as a litigant, will include his wife. Likewise, references to Mohammad, as a litigant, will include Active.

First, Mohtasham was unable to produce the original Agreement: "[Mohtasham]is a sophisticated real estate investor, who has handled numerous purchases of commercial real estate, in the millions of dollars, and who customarily keeps the key documents neatly indexed in a binder, yet in this case, the original of the Lease Agreement . . . is missing."

"Second, the term of the Lease is suspiciously a four-year term, from September 2011 to August 2015. The termination date very nearly corresponds with the brothers falling out in 2015, after the parties could not agree what to do next with the property."

"Third, it seems unlikely to the Court that [Mohtasham] would not enforce his rights under the agreement for almost four years . . . . The Court considered [Mohtasham]'s explanation; that [Mohtasham] was waiting for Active Mobility's business to get healthy at the new location . . . . However, the more credible version, and the one the Court chooses to adopt, is that Active Mobility was doing well at the old . . . location, and that Active Mobility moved . . . as an accommodation to the partnership so that the brothers could market the property as an occupied ongoing business locale to prospective purchasers."

Finally, it found that Mohammad's expert was "more credible" than Mohtasham's expert. Thus, it concluded that Mohtasham had not proven that a "valid and enforceable written contract" existed. The court noted the dispute over whether it was Active or Health that moved to the Property in 2011, but did not find it necessary to resolve it.

In January 2018, it entered judgment accordingly.

11

In February 2018, Mohtasham filed a motion for new trial. He argued, among other things, that:

1. Mohammad had prevented a fair trial by hiding a witness, namely Freshta. In a posttrial deposition, Freshta had contradicted Mohammad's trial testimony.

2. In a posttrial deposition, Mohammad had contradicted his own trial testimony by stating that Active was doing poorly at the Old Property.

3. Mohammad had testified falsely at trial.

In March 2018, after hearing argument, the trial court denied the motion.

III

ASSERTEDLY ERRONEOUS FINDINGS

Mohtasham contends that the trial court's statement of decision "contained key factual errors," "inaccuracies and inconsistencies."

"While reviewing a judgment based upon a statement of decision following a bench trial, the appellate court reviews the trial court's findings of fact under a substantial evidence standard. [Citation.]" (*Jackson v. LegalMatch.com* (2019) 42 Cal.App.5th 760, 767.)

"[I]f, as [appellant] here contend[s], 'some particular issue of fact is not sustained, [he is] required to set forth in their brief *all* the material evidence on the point and *not merely* [*his*] *own evidence*. Unless this is done the error is deemed to be waived.' [Citations.]" (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881-882.) Mohtasham has not done this; thus, he has forfeited the point.

12

We do not mean to suggest that, if not forfeited, it would have merit. Mohtasham specifies three findings that are assertedly erroneous.[6] We discuss these seriatim.

First, that "[Mohtasham] is a sophisticated real estate investor, who has handled numerous purchases of commercial real estate, in the millions of dollars . . . ." Based on this, and based on his practice of keeping important documents in binders, the trial court found it improbable that he had simply lost his copy of the Agreement.

Mohtasham testified that he and Mohammad had co-owned other properties in the past. Mohammad testified: "We bought houses. We rented some of them, and some of them we sold back, or some of them we refinanced and bought other homes with them." He and Mohtasham also bought a former car dealership building in Hemet; the down payment was $100,000. And, of course, Mohtasham and Mohammad bought the New Property together, for $550,000.

---

[6] In his brief in lieu of oral argument, Mohtasham challenges four additional findings. However, he did not challenge these findings in his opening brief. For example, while he may have asserted, as a factual matter, that Gonzales had better credentials than Wakshull, he never argued that the trial court erred by finding Wakshull credible. (See Cal. Rules of Court, rule 8.204(a)(1)(B) [brief must "[s]tate each point under a separate heading or subheading summarizing the point"].) He has therefore forfeited any such challenge. (See *Petrovich Development Company, LLC v. City of Sacramento* (2020) 48 Cal.App.5th 963, 976, fn. 9.)

In any event, Mohtasham continues to ignore the substantial evidence standard of review and to cite only the evidence favorable to him. He also ignores the applicable burden of proof. For example, the trial court found it "suspicious[]" that the lease term ended right around the time the brothers had a falling out. Mohtasham argues that a suspicion is not substantial evidence. However, it was Mohtasham who bore the burden of proving a valid written lease. Therefore, if the trial court found the evidence of the lease "suspicious[]" — i.e., not credible — it could find against him for that reason alone.

13

Mohtasham objected to this language in the tentative statement of decision. The trial court conceded that he was in the business of buying and selling residential real estate, not commercial real estate. Nevertheless, it concluded that he was "very sophisticated." It did not change this language in its final statement of decision.

The evidence supported everything about the language quoted, except as to whether Mohtasham had purchased "numerous" pieces of "commercial" real estate. Actually, he had purchased two pieces of commercial real estate, and numerous pieces of residential real estate. The inaccuracy is trivial and not prejudicial. (Cal. Const., art. VI, § 13; Code Civ. Proc., § 475; *Elsner v. Uveges* (2004) 34 Cal.4th 915, 939.) There was still substantial evidence that Mohtasham was a sophisticated real estate investor. That, together with his practice of keeping important documents organized in binders, amply supported the trial court's reasoning.

Second, "regarding whether Mohammad's businesses occupied the Property in 2011, or not . . . ." The trial court made no finding on this point, and it was irrelevant to its reasoning.

Third, whether the brothers received an offer to lease the New Property in 2013 or in 2015. In its tentative statement of decision, the trial court found that the offer was made in 2015, that Mohtasham's rejection of this offer led to the brothers falling out, and thus that it was "suspicious[]" that the Agreement provided for an end date in 2015.

Mohammad testified that Mohtasham wanted to relist the New Property for sale "in 2013 *and* 2014." (Italics added.) The brothers listed it for six months and, sometime

14

after that listing expired, for another six months. "During" the second six months, the offer came in. Mohammad was then asked whether "he said 2013." He responded, "2013, 2014."

Admittedly, this testimony leaves the date range broad. However, if Mohtasham wanted to list the property in 2014, and if substantially more than six months went by after that, that would place the offer in late 2014 or early 2015.

Mohtasham objected to the 2015 finding. His counsel represented (incorrectly) that the offer was "in fact" made in 2013, and that there was "no evidence" that it was made in 2015. Based on this, the trial court changed the date to 2013 in its final statement of decision.

In sum, the final statement of decision used the 2013 date that Mohtasham wanted, even though there was substantial evidence supporting the 2015 date. Moreover, the trial court observed, "Whether it was 2013 or 2015 seems to be immaterial to the court." It changed the date in its findings but commented, "That's not going to change my ruling at all." Accordingly, Mohtasham cannot claim that the finding was erroneous, much less that it was prejudicially erroneous.

IV

THE MOTION FOR NEW TRIAL

A. *Applicable Legal Standards.*

"The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable

15

abuse of discretion clearly appears, and the order will be affirmed if it may be sustained on any ground, although the reviewing court might have ruled differently in the first instance." (*Shaw v. Pacific Greyhound Lines* (1958) 50 Cal.2d 153, 159.)

One of the grounds for a new trial is an "[i]rregularity in the proceedings . . . by which either party was prevented from having a fair trial." (Code Civ. Proc., § 657, subd. (1).)

Another is "newly discovered evidence." (Code Civ. Proc., § 657, subd. (4).) "However, new trials for newly discovered evidence are disfavored. [Citation.] A party moving for new trial on the basis of newly discovered evidence must show: (1) the evidence is newly discovered, (2) it could not with reasonable diligence have been discovered and produced earlier, and (3) the evidence is material. [Citation.] Evidence is material if it is likely to have produced a different result. [Citation.] Whether a reasonable effort was made to discover the evidence, and whether it was material are questions addressed to the sole discretion of the trial court, and will not be disturbed absent a manifest showing of abuse of discretion. [Citations.]" (*Missionary Guadalupanas of Holy Spirit Inc. v. Rouillard* (2019) 38 Cal.App.5th 421, 438.)

B.      *Refusal to Consider the Entire Record*.

Mohtasham contends that, in ruling on the motion for new trial, the trial court did not consider the whole record; it considered only the evidence that supported its statement of decision, and it disregarded the evidence that undermined its statement of decision.

The California Constitution requires a trial court, in ruling on a motion for new trial, to consider the entire record. (Cal. Const., art. VI, § 13.) "[W]e must indulge in the presumption that the trial court obeyed this mandate of the Constitution and considered the whole record in the case . . . ." (*Bieser v. Davies* (1932) 119 Cal.App. 659, 663.)

In support of this contention, Mohtasham repeatedly cites a single page of the record. On that page, the trial court said, "We've spoken quite at length in this case with regards to the statement of decision, and I think we've covered just about every issue. I understand there's some new items that were raised in the motion for new trial. However, the Court finds that there is no newly discovered evidence. The Freshta testimony does not constitute newly discovered evidence." Later, it also commented, "You've raised some contradictions and issues, but as far as the Court is concerned, you have not connected the dots. A lot of those contradictions are not material to the Court's finding. The bottom line is the Court found that [Mohammad] did not sign the lease, and that is the quintessential finding of this Court. I don't see how anything that Freshta says is going to change the Court's opinion in that regard." We find nothing in these comments suggesting that the trial court considered only the evidence that supported the statement of decision.

Mohtasham also asserts that the trial court erred by "refus[ing] to consider the new evidence, saying it was not new." As we read its comments, however, the trial court acknowledged that there was new evidence. It ruled, however, that this evidence did not constitute "[n]ewly discovered evidence" within the meaning of Code of Civil Procedure

17

section 657, subdivision 4.  In other words, *either* it was not newly discovered, *or* it could have been produced earlier, *or* it was not material.  (See part IV.A, *ante*.)  We now proceed to review this ruling in parts IV.C, IV.D, and IV.E, *post*.

      C.      *New Evidence from Freshta's Posttrial Deposition*.

Mohtasham contends that he was entitled to a new trial based on new evidence from a posttrial deposition of Freshta.

      1.      *Additional factual and procedural background*.

As of October 2015, Freshta was listed with the Secretary of State as the Secretary, Chief Financial Officer, and a Director of Active.  As of August 2016, however, she was not.

In July and August 2016, Mohtasham attempted to depose Freshta without subpoenaing her.  Counsel for Mohammad, however, responded that a subpoena would be necessary because Freshta no longer worked for Active.

Hence, Mohtasham attempted to subpoena Freshta.  Despite eight attempts over ten days to serve her at the three addresses that it had for her, it was never able to do so.

At trial, Habib testified that Freshta was no longer working for Active.  He also testified that Mohtasham had threatened to sue Freshta — he told her, "however this is going to go, he's going to go after her as well . . . ."  That was why Freshta left Active.  It was also why she evaded the subpoena; as a result of Mohtasham's threat, "she didn't want anything to do with it."

After the trial in this case, Mohtasham attempted to depose Freshta in the Other Action. This time, he succeeded.

At her deposition, Freshta testified:

1. She had just started working for Active again on the Saturday before the deposition.

2. In 2011, she "tried to open" Health; this included filing a fictitious business name statement. Later, however, Mohammad "put it in his name."

3. She "never operated a business that was [her] business out of the . . . [New P]roperty."

4. She was asked, "Was that the case, that the business was having some financial trouble at the old location?" She answered, "A little bit, just because [an employee] was stealing, but mostly, it was just, like, the vandalism. They would break the windows every so often. There was a bad homeless people problem. Just a bad, bad neighborhood."

5. Mohtasham suggested opening Active somewhere near the freeway, because the Old Location "was terrible and it wasn't really safe . . . ." He "said he would help us . . . since we weren't doing so great and everything."

2. *Discussion*.

a. *Suppression of evidence*.

Mohtasham argues that Mohammad suppressed evidence by preventing him from deposing Freshta. We may assume, without deciding, that the suppression of material

19

evidence would constitute an "[i]rregularity in the proceedings." (Code Civ. Proc., § 657, subd. (1).)

The evidence, however, fails to show that Mohammad suppressed evidence. If anyone did, it was Mohtasham (albeit inadvertently). When he was trying to depose Freshta, she was neither a party nor an employee of a party. Hence, Mohammad had no duty to produce her for deposition. (Code Civ. Proc., § 2025.280, subd. (a).) Although she did evade service, there was no evidence that Mohammad induced her to do so. Habib testified that she evaded service because Mohtasham had threatened to sue her.

### b. *Newly discovered evidence.*

Mohtasham also argues that Freshta's deposition testimony in the Other Action was newly discovered evidence.

First, he claims that Mohammad had testified that Health, "owned by Freshta," opened at the New Property in 2011, but Freshta contradicted this by testifying that she never operated a business at the New Property. The cited portions of the trial evidence, however, are consistent with Freshta's deposition testimony.

Admittedly, Habib testified that Freshta was the "first" owner of Health. Mohammad himself testified that Freshta was the owner of Health "when [he] first set it up[.]" This was consistent with the evidence at trial, as well as Freshta's deposition testimony, that she filed Health's initial fictitious business name statement. Although she was the owner on paper, however, she was acting for Mohammad, and that only for a short time; in September 2011, he put Health in his own name. Thus, the trial evidence

20

was completely consistent with Freshta's deposition testimony that she never "operated a business that was [her] business" at the New Property.

Second, Mohtasham claims that Freshta testified that Active was struggling financially; this would have supported Mohtasham's explanation of why he put off demanding rent payments. Actually, she paraphrased *Mohtasham* as saying that Active was not "doing so great." However, she did not confirm that this was true. To the contrary, she testified that Active was having a "little" financial trouble — i.e., a manager was stealing — but this was a minor problem (as compared to vandalism).

Separately and alternatively, it is important to remember that this was a bench trial, in which the trial court was the trier of fact. The fact remains that Mohammad denied ever signing the Agreement; Mohtasham could not produce his copy of the Agreement; and Mohammad's expert witness — whom the trial court found credible — opined that his signature was not genuine. Thus, even assuming Freshta's deposition testimony did differ from the evidence at trial, the trial court could reasonably conclude that the differences were not material.

c.     *Potential additional testimony.*

Mohtasham argues that Freshta was knowledgeable about the QuickBooks records; if he had been able to call her at trial, she might have contradicted Mohammad's testimony that they were inaccurate. This is purely speculative. There is no evidence that she would, in fact, have so testified.

21

D.     *New Evidence from Mohammad's Posttrial Deposition.*

Mohtasham contends that he was entitled to a new trial based on new evidence from Mohammad's deposition in the Other Action.

1.     *Additional factual and procedural background.*

When Mohammad was deposed in the Other Action, he testified in general that Mohtasham lent him money and helped him out financially.

He also testified that, in a year he did not remember, a vendor named Pride Mobility Products had refused to sell to Active, because Active "was financially broke and . . . couldn't make the payments."

2.     *Discussion.*

In its statement of decision, the trial court rejected Mohtasham's claim that the reason why he did not demand back rent was that he knew Mohammad was short of money.  It explained, in part, that it believed Mohammad's testimony that Active was doing well at the Old Location.  Mohtasham argues that Mohammad's deposition testimony (1) that Mohtasham helped him out financially, and (2) that Active could not pay a vendor, corroborated his claim and undercut the trial court's reasoning.

At trial, however, Mohtasham testified that he helped Mohammad out financially, lending him a total of nearly $1.3 million between 2007 and 2014.  There was some documentary evidence of this, and Mohammad never denied it.  Thus, Mohammad's admission that Mohtasham helped him out was not new evidence.

22

The fact that Active could not pay one vendor, at an unspecified time, did not refute Mohammad's testimony that Active was generally doing well at the Old Location. Moreover, at trial, Mohammad admitted that, at one point, an employee stole money from Active, which caused "financial problems."

Separately and alternatively, we repeat, the trial court was the trier of fact; thus, it could reasonably conclude that the new evidence was not material. Even if it agreed that Mohammad's deposition contradicted his trial testimony, and even if it agreed that Active was in financial trouble at the Old Location, it could still conclude that there was no written contract. For example, it could reason that, if the contract did exist, while Mohtasham might not have demanded immediate payment, he would at least have discussed the rent arrears with Mohammad. He would not have let four years of nonpayment go by without comment.

Finally, the complaint alleged a written contract, not an oral contract. (See part V, *post*.) Even if the trial court agreed that Mohtasham was telling the truth about why he did not demand payment, it could *still* find that he failed to prove a *written* contract — based, if necessary, solely on the testimony of Mohammad's expert.

E.    *Evidence that Mohammad Committed Perjury*.

Mohtasham contends that he was entitled to a new trial based on evidence that Mohammad committed perjury.

23

1.     *Additional factual and procedural background.*

a.     *Mohammad's trial testimony.*

At trial, Mohammad gave some inflammatory and largely irrelevant testimony tending to besmirch Mohtasham.[7]

First, he suggested that Mohtasham cheated him out of a house he used to own in Moreno Valley. Some time after the Gulf War, Mohammad filed a bankruptcy. He was also paying child support. At Mohtasham's suggestion, for asset protection purposes, Mohammad quitclaimed his house in Moreno Valley to Mohtasham's wife. He never got it back. Mohtasham's counsel did not object to any of this testimony.

Second, Mohammad suggested that Mohtasham cheated him out of a business he had started. He testified that he set up a medical supply business called Wheelchairs, Etc. He brought Mohtasham and a third brother into the business. While he was out of the country, he testified, the other brothers "start[ed] fighting. By the time I came back, I was fired . . . . They took my car, they took my phone, everything." Mohtasham's counsel objected just once, midway through this testimony, based on relevance; the trial court overruled the objection.

b.     *Motion for new trial.*

In support of his motion for new trial, Mohtasham denied these allegations.

---

[7]     Mohtasham himself was not innocent in this respect. At one point, he volunteered that Active had obtained "money . . . from Medicare and Medi-Cal illegally . . . ."

He testified that he and his wife owned the Moreno Valley house; Mohammad was on the title only to help them qualify for a loan. Eventually, with Mohammad's consent, they sold the house to third parties. Moreover, the house was sold in 1993; Mohammad did not file his bankruptcy until 1997.

Mohtasham further testified that he and his wife created Wheelchairs, Etc.; Mohammad never had any interest in it.

2. *Discussion.*

The motion for new trial made at least a prima facie case that Mohammad lied under oath. Indeed, Mohammad's counsel did not argue otherwise. Nevertheless, the trial court could properly deny the motion.

The evidence in support of the motion was not new. Mohtasham had personal knowledge that he did not cheat Mohammad. He could have so testified at trial. He claimed that he was surprised by the testimony, and thus he "did not have the documents necessary" to disprove Mohammad's claims. Surprised he may have been, but he could still have testified that Mohammad was lying. The supporting documents were all of the sort that would naturally have been in his possession (e.g., the title insurance policy for the Moreno Valley house). If he needed more time to produce them, his counsel could have requested a continuance. Mohtasham claims the issue had not been raised in discovery; but if so, his counsel could also have objected on that ground. Thus, Mohtasham did not exercise reasonable diligence.

25

Presumably for this reason, his motion did not so much as argue that this was newly discovered evidence (nor did it argue surprise). Rather, it argued only that Mohammad's false testimony constituted an improper appeal to sympathy and prejudice, and hence an "irregularit[y] in the proceedings."

"[W]here irregularity of proceedings is relied upon as a ground for new trial, the movant must show that he and his counsel were ignorant of the facts constituting the charge until the rendition of the verdict, since it is settled that a party may not remain quiet, taking his chances upon a favorable verdict, and, after a verdict against him, raise a point of which he knew and could have raised during the progress of the trial. [Citations.]" (*Cembrook v. Sterling Drug Inc.* (1964) 231 Cal.App.2d 52, 67.) As already discussed, Mohtasham's counsel could and should have raised the issue below.

And finally, yet again, because the trial court was the trier of fact, it could reasonably conclude that the apparent perjury was not material. We repeat, the false testimony went to largely irrelevant matters. (See *Guy v. Hanly* (1863) 21 Cal. 397, 399 [false testimony on an irrelevant point did not require a grant of a new trial].) At most, it detracted from Mohammad's credibility. In its statement of decision, however, the trial court did not focus on Mohammad's testimony. It focused on whether Mohtasham's testimony was credible and whether he had met his burden of proving a written contract; it concluded that he had not. It also relied on the testimony of Mohammad's expert. Thus, even after considering the apparent perjury, it could still find for Mohammad.

26

V

DENIAL OF LEAVE TO AMEND TO ALLEGE AN ORAL CONTRACT

Mohtasham contends that the trial court erred by denying leave to amend the complaint to conform to proof.

A.      *Additional Factual and Procedural Background.*

In Mohtasham's objection to the tentative statement of decision, he argued (among other things) that it failed to make any finding with respect to whether there was an enforceable *oral* lease agreement.

In his opposition, Mohammad responded that Mohtasham had not alleged an oral lease agreement.

In his reply, Mohtasham stated, "Plaintiffs hereby move to amend to conform to proof of the existence of an oral agreement to pay rent that was partially performed."

At the hearing on the objections, counsel for Mohammad responded further that allowing an amendment would be "patently prejudicial." He added that Mohtasham had not filed a noticed motion for leave to amend. He represented that, in the trial of the Other Action, Mohtasham had asserted a claim for rent on a quantum meruit theory before Judge Trask, and Judge Trask had tentatively denied it. He conceded that she had not yet entered a final judgment, but he argued that there was a potential for inconsistent rulings.

The trial court denied the request for leave to amend. Mohtasham then requested "the opportunity before judgment is entered in this case to file a noticed motion for leave

27

to amend to conform to proof . . . ." The trial court responded, "I'm not going to amend according to proof, not at this point."

B.    *Discussion.*

"'"'[T]he trial court has wide discretion in allowing the amendment of any pleading [citations], [and] as a matter of policy the ruling of the trial court in such matters will be upheld unless a manifest or gross abuse of discretion is shown. [Citations.]'" [Citation.] Nevertheless, it is also true that courts generally should permit amendment to the complaint at any stage of the proceedings, up to and including trial. [Citations.] But this policy applies "'only "[w]here no prejudice is shown to the adverse party."'" [Citation.] Moreover, "'"even if a good amendment is proposed in proper form, unwarranted delay in presenting it may — of itself — be a valid reason for denial."'" [Citations.] Thus, appellate courts are less likely to find an abuse of discretion where, for example, the proposed amendment is "'offered after long unexplained delay . . . or where there is a lack of diligence . . . .'" [Citation.]' [Citation.]" (*Doe v. Los Angeles County Dept. of Children & Family Services* (2019) 37 Cal.App.5th 675, 689.)

Here, Mohtasham was aware of the need to amend before trial ended. When counsel for Mohtasham was asking about Active's failure to pay rent, even though it had the use of the New Property, counsel for Mohammad objected that the complaint had not alleged an oral lease agreement. Counsel for Mohtasham responded, "*We haven't at this moment asked for that amendment*, but we may." (Italics added.) He also argued that the question was appropriate cross-examination. The trial court overruled the objection.

28

Nevertheless, Mohtasham did not request leave to amend until seven months after the trial ended, and after the trial court had already rendered its tentative statement of decision. The trial court could reasonably find an unwarranted delay in requesting leave to amend. And it did so find — it commented that it was not going to allow leave to amend "at this point."

Mohtasham cites *Hoffman-Haag v. Transamerica Ins. Co.* (1991) 1 Cal.App.4th 10 for the proposition that a new legal theory can be raised for the first time in a motion for new trial. What that case actually says, however, is that a new theory can be raised in a motion for new trial, "*so long as the new theory presents a question of law to be applied to undisputed facts in the record.*" (*Id.* at p. 15, italics added.) That is not the case here. Mohammad vehemently denied ever agreeing to pay rent, and Mohtasham failed to demand it.

We may uphold the trial court's ruling based on unwarranted delay alone. Mohammad did not have to also show prejudice. Nevertheless, if such a showing was required, he complied. His counsel represented that the issue had been tried before Judge Trask, but not yet adjudicated. Admittedly, he did not introduce any evidence of this; however, "' . . . attorneys are officers of the court, and "'when they address the judge solemnly upon a matter before the court, their declarations are virtually made under oath.'"' [Citation.]" (*People v. Mroczko* (1983) 35 Cal.3d 86, 112, disapproved on unrelated grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Thus, Mohammad showed that there was a risk of inconsistent decisions.

29

Mohtasham argues that "[c]ollateral estoppel did not apply." It does not appear, however, that the trial court relied on collateral estoppel, as such.

We therefore conclude that the trial court did not err by denying leave to amend.

VI

DISPOSITION

The judgment is affirmed. Mohammad (including Active) is awarded costs on appeal against Mohtasham (including Maria).

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

MILLER
J.

CODRINGTON
J.