Filed 5/13/25  P. v. Fraysure CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B327864 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA148918) |
| v. | |
| DAVID ANDREW FRAYSURE, JR., | |
| Defendant and Appellant. | |

Appeal from the judgment of the Superior Court of Los Angeles County, John J. Lonergan, Jr., Judge.  Affirmed.

Verna Wefald, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and David A. Voet, Deputy Attorneys General, for Plaintiff and Respondent.

—————————————

In May 2019, surveillance cameras captured the sound of three gunshots fired at 19-year-old Exodus Foisia as he was leaving a party.  One shot proved fatal.  Although the cameras did not capture an image of the shooter, a witness saw the suspect—wearing a gray sweatshirt bearing a white emblem—flee the scene.  The witness later identified appellant David Fraysure as the shooter.

Fraysure told detectives he had not attended the party.  But text messages and cell site analysis placed Fraysure's phone in the vicinity of the shooting.  Text messages also supported that Fraysure's girlfriend brought him a gun the day before the party.  Ballistics analysis confirmed that a bullet recovered from Foisia's body could have been fired from a handgun depicted in photographs found on Fraysure's phone.  And shortly after the shooting, investigators found gunshot residue on a gray sweatshirt with a white emblem recovered from the trunk of Fraysure's car.  In addition, the shooting took place in Victoria Park Locos gang territory, and evidence supported that Fraysure was a member of the gang.  Finally, text messages and records of the internet search history on Fraysure's phone evidenced his consciousness of guilt.

After a two-month trial, a jury convicted Fraysure of first degree murder (Pen. Code, § 187, subd. (a)).[1]  The jury also found true that Fraysure had killed Foisia using a handgun (§ 12022.53, subd. (d)), and that Fraysure had committed the murder for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)).  The trial court sentenced him to 50 years to life in prison.

Fraysure now asks us to reverse his conviction, advancing four arguments.  First, that Fraysure did not validly waive the conflict created by certain criminal charges pending against his

---

[1] Subsequent statutory references are to the Penal Code.

defense attorney, Matthew Fletcher.  Second, the court erred in refusing to bifurcate the section 186.22 gang allegation.  Third, defense counsel rendered ineffective assistance by failing to move for a mistrial after the prosecution belatedly disclosed a video showing Fraysure attended the party.  Fourth, the cumulative effect of these errors compels reversal.

We conclude, however, that Fraysure is not entitled to relief. The record demonstrates that Fraysure knowingly and intelligently waived his defense attorney's conflict.  Further, Fraysure fails to demonstrate prejudice from the purported error in failing to bifurcate his trial or from defense counsel's allegedly ineffective assistance.  And the strength of the prosecution's case against Fraysure defeats his cumulative error argument.

Accordingly, we affirm.

## FACTUAL SUMMARY AND PROCEDURAL HISTORY[2]

### A. *The Shooting*

On May 4, 2019, at approximately 1:14 a.m., someone shot Foisia outside a party at a residence on Milmore Avenue in Carson. Neighbors' surveillance cameras recorded the sound of gunshots, but did not capture any images of the shooter.  Foisia suffered gunshot wounds to his chest, the right side of his torso, and his hand.  An autopsy confirmed that he died as a result of the gunshot wounds to his chest.

Janei Fuamatu, Foisia's cousin, told investigators she was sitting in her car on Milmore Avenue at the time of the shooting. After Fuamatu heard the first gunshot, she looked up, saw Foisia fall to the ground, and saw a person run past her car.

---

[2] We summarize here only the facts and procedural history relevant to our resolution of this appeal.

She described the person as "a male Hispanic approximately a hundred forty to a hundred fifty pounds with a fade haircut[,] [a]nd wearing a gray hooded sweatshirt with . . . some type of white emblem." After "ask[ing] around," Fuamatu found photographs on social media of the person she had described to police—Fraysure— and provided the photographs to investigators.

### B. *Fraysure's Arrest*

Five days after the shooting, officers interviewed Fraysure at his place of work. Fraysure denied attending (or even knowing about) the party. Nonetheless, the officers arrested Fraysure, seizing his cellular phone and impounding his vehicle. From the trunk of Fraysure's car, a forensic investigator recovered a gray sweatshirt bearing a white emblem.

### C. *Fraysure's Waiver of Fletcher's Conflict of Interest*

The district attorney charged Fraysure with one count of murder (§ 187, subd. (a)) and a firearm use enhancement (§ 12022.53, subd. (d)). In addition, the district attorney alleged that Fraysure had murdered Foisia for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)).

At a June 2019 pretrial hearing, an attorney standing in for Fletcher requested that the court substitute Fletcher in place of the public defender as counsel for Fraysure. At the time, Fletcher was facing criminal charges by the Los Angeles County District Attorney's Office arising out of Fletcher's alleged participation in a conspiracy to bribe witnesses and suborn perjury in the murder trial of former music industry executive Marion "Suge" Knight.

The trial court engaged in an extended colloquy with Fraysure informing him of the conflict created by Fletcher's then-pending criminal prosecution:

4

"The court:  . . . [I]s that what you want, you want Mr. Fletcher to represent you in this case?

"[Fraysure]:  Yes.

"The court:  So Mr. Fraysure, I want to kind of advise you of something.  This is pursuant to a decision that was rendered by the Court of Appeal in the case of *People versus Harris*.[3]  I will provide the citation for the record in a moment.  But Mr. Fletcher, the attorney that you want to represent you is currently being prosecuted for multiple felonies by the same exact office, the Los Angeles County District Attorney's Office, that is prosecuting you.  Do you understand that?

"[Fraysure]:  Yes.

"The court:  Okay.  When that occurs, when your attorney is being prosecuted by the same office that is prosecuting you, there exists what we refer to in the law as an actual conflict of interest.  Do you understand that?

"[Fraysure]:  Yes.

"The court:  The reason that there's a conflict of interest, at least according to the case law, is that it may affect Mr. Fletcher's ability or desire to zealously represent you, the theory being that he might not zealously represent you because he might want to curry favor with the prosecutors.  He might lay down on your case to gain a benefit for his own case.  Do you understand what I'm saying?

"[Fraysure]:  Yes.

"The court:  Do you have any questions about that?

---

[3] Fraysure contends, and we agree, that the court likely intended to reference the decision in *Harris v. Superior Court* (2014) 225 Cal.App.4th 1129, in which another panel of this court determined that an actual conflict existed where a lawyer faced prosecution by the same district attorney's office prosecuting his client.  (See *id.* at p. 1141.)

5

"[Fraysure]: No.

"The court: Do you waive that conflict of interest? Do you understand that conflict of interest, and do you waive it, meaning do you understand what I'm saying?

"[Fraysure]: Yeah, I understand.

"The court: Do you waive the conflict?

"[Defense counsel standing in for Fletcher]: One moment, Your Honor. He has a question.

"(Whereupon counsel and [Fraysure] confer sotto voce.)

"[Fraysure]: Yes.

"The court: What I'm asking you if you waive the conflict of interest, what it means is that let's say in a year from now or five years from now or 20 years from now, depending upon when it is, if you have an adverse verdict in this case, if you're found guilty or if you plead guilty in some way and you're sentenced to prison, and you suddenly look back at the case and you decide, you know what, I didn't like what happened. Part of the reason I didn't like what happened is I didn't like the way Mr. Fletcher represented me. Part of the reason I didn't like the way he represented me was there was a conflict between myself and him because he's being prosecuted by the same agency.

"When you waive that conflict of interest, it means you can no longer argue that ever. You're precluded from raising that. It's done because you've already told me[,] 'I don't care.'

"Do you understand what I'm saying?

"[Fraysure]: Yes.

"The court: Okay. [Defense counsel,] I'm going to ask that you file a signed, written waiver, so let Mr. Fletcher know. The case is pretty easy to find. It's *People versus Harris*. And that Mr. Fraysure sign a written waiver.

"With that said, I'll allow the substitution of attorney."

6

On August 13, 2019, Fletcher filed a document titled "waiver of alleged conflict" consisting of a declaration signed by Fraysure. (Capitalization omitted.) In the declaration, Fraysure attests, in pertinent part:

"I am aware that the same district attorney's office that is prosecuting me is also prosecuting my attorney, Matthew Fletcher. [¶] . . . I am aware that I am entitled to conflict free representation. [¶] . . . I am aware that I have the right to speak with another completely independent attorney to discuss any alleged conflicts between my attorney, Matthew Fletcher[,] and myself or the District Attorney of Los Angeles County. [¶] . . . I do not wish to speak with any other attorney; nor any representative from the government. [¶] . . . I waive any alleged conflict between myself; Mr. Matthew Fletcher and/or the District Attorney of Los Angeles County." (Capitalization added & omitted.)

Fletcher represented Fraysure through the verdict. Jury selection in Fletcher's own trial commenced before closing arguments in Fraysure's case and continued while Fraysure's jury was deliberating. Fletcher nonetheless gave the closing argument, in person, in Fraysure's trial.

Fletcher ultimately pleaded guilty to two of the seven counts against him, in exchange for dismissal of the remaining charges. Fletcher surrendered his license to practice law following his plea, and Fraysure retained new counsel to represent him at sentencing and in post-trial proceedings.

## D. *Trial Evidence*

During the two-month trial, the prosecution introduced seven categories of evidence to prove Fraysure's guilt. The defense, in response, offered evidence suggesting an unidentified Crip's gang member robbed and murdered Foisia.

### 1. *Fuamatu's testimony*

Fuamatu testified she and Foisia attended the party together, although in two different cars. After approximately two hours, they decided to go to a cousin's house. As Fuamatu exited the party, she saw Foisia having a "normal conversation" with someone. Fuamatu entered her car, heard gunshots, and looked up to see Foisia fall to the ground. The shooter ran past her car, which was "how [she] was able to identify [him]."

Fuamatu further testified she had seen Fraysure "throughout the party . . . with his crew," and that Foisia had pointed Fraysure out to her. She described Fraysure as "[a]t first . . . wearing a white T-shirt, jeans, [and] white shoes," but later changing into a "hoodie" that was "gray with a white logo." In addition to identifying Fraysure as the shooter from a social media photograph, Fuamatu identified Fraysure in a six-pack photographic line-up and in court at trial.

On cross-examination, contrary to her preliminary hearing testimony, Fuamatu admitted she had been drinking at the party. She explained she had lied because she was under legal drinking age. In addition, Fuamatu had difficulty recalling the description of the shooter's height and facial hair she originally provided to detectives. Fuamatu admitted she did not recall seeing an unidentified individual in a white shirt outside the party after the shooting, although the individual is visible in a still image excerpted from surveillance footage.

On redirect examination, Fuamatu testified her alcohol consumption did not prevent her from recognizing the shooter. She further testified the person in a white shirt could not have shot Foisia because the shooter fled the scene immediately after shots were fired.

### 2. *Additional eyewitness testimony placing Fraysure at the party*

Faith Vaifanua, another of Foisia's cousins, and Merlyn Aoatoa, a family friend, each testified they saw Fraysure at the party.

Vaifanua testified Fraysure was wearing a hat and a gray sweatshirt. Although when first asked, and without looking around, Vaifanua could not identify Fraysure, she positively identified him after the court instructed her to "look at everybody in the courtroom."

Aoatoa testified she saw Fraysure at the party and recognized him because they had attended middle school together. She conceded on cross-examination that she had smoked marijuana during the party, but maintained the drug did not have "an effect on [her] ability to remember or perceive" who had attended the party.

### 3. *iPhone "pindrop" evidence and cell site analysis placing Fraysure at the party*

A crime analyst testified that at 10:51 p.m. on May 3, 2019 (i.e., several hours prior to the shooting), Fraysure's phone sent a "pindrop"—a function that allows an iPhone "to mark [a person's] location"—from Milmore Avenue to a contact labeled "Lizard." Contemporaneously with the pindrop, Fraysure's phone sent text messages to Lizard that read, "Come" and "[p]arty."

The analyst also testified, based on an analysis of cell tower sites, that someone placed or received more than a dozen calls from Fraysure's phone at or near the party in the hours leading up to the shooting. The cell site data were "consistent with [Fraysure's] phone initially being in the neighborhood of the [party] and then shortly after the time of the shooting traveling eastward along the 91 [freeway]."

9

The defense challenged that the cell phone evidence supported an inference Fraysure shot Foisia on the ground that Fraysure's home was in the same neighborhood as the party and cell site analysis can place a phone only in a general vicinity.

### 4.    *Gunshot primer residue analysis*

A senior criminalist with the Los Angeles County Sheriff's Department's crime lab tested the right arm, the left arm, the chest area, the abdomen area, and the hood of the gray sweatshirt recovered from Fraysure's car for gunshot primer residue. She testified all five samples tested positive, consistent with the sweatshirt having been within three feet of a discharged firearm.

Defense counsel tried to elicit that there could be other sources of this residue. Although no evidence established that Fraysure personally used a nail gun at the construction site where he worked, defense counsel asked the criminalist on cross-examination whether nail guns can generate gunshot residue. The criminalist testified that nail guns can generate residue similar to that produced by firearms, but the residue on the gray sweatshirt was inconsistent with nail gun residue because it did not contain elevated levels of the metals typically found in nails.

The criminalist agreed with defense counsel that it theoretically is possible for officers who carry firearms to contaminate evidence with gunshot residue from their own weapons. She explained, however, that for cross-contamination to have been the source of the large quantity of residue detected on Fraysure's sweatshirt, an officer "would essentially have to rub the entire sweatshirt and all areas of the sweatshirt onto a surface with [gunshot residue] in order to really get that friction and transfer it throughout the whole thing."

10

### 5. *Evidence that Fraysure possessed a gun consistent with the murder weapon*

Investigators never located the murder weapon. The following text exchange between Fraysure and his girlfriend, however, supported that Fraysure obtained a gun on the day before the party:

"[Fraysure:] Did you get the heat?[4]

"[¶] . . .[¶]

"[Girlfriend:] Ima stop by my house after I get [B]ecca and I'll get it[.]

"[Fraysure:] Wow[.] The small one[.]

"[Girlfriend:] Okay bullets or no[?] [A]nd [J]ess is taking me to my house[.] [I]s it bad if she sees it[?]

"[Fraysure:] I have bullets in it[.] Don't let her[.] Just put it in your purse[.]

"[Girlfriend:] Okay my love[.] Okay got it[.] [Thumbs up emoji.]

Four hours later, Fraysure and his girlfriend exchanged texts appearing to confirm Fraysure's receipt of the gun:

"[Fraysure:] Where's my thing [a]t?

"[Girlfriend:] The bag.

"[Fraysure:] Where's the bad[?] Bag[?]

"[Girlfriend:] [C]loset[.]"

A firearms expert opined the lone bullet recovered from Foisia's body "was either fired from a .38 special or a .357 magnum caliber firearm." The expert testified further that a March 2018 photograph extracted from Fraysure's phone depicted what appeared to be a .357 magnum caliber revolver. Two photographs

---

[4] The prosecution's gang expert testified that "heat" can be "[a]nother word for gun."

11

of Fraysure, taken in July 2017 and April 2018, showed him holding what looked like the gun from the March 2018 photograph.

### 6. *Post-shooting text messages and internet search history evidencing Fraysure's consciousness of guilt*

Fraysure and his girlfriend exchanged the following text messages the morning after the shooting:

"[Girlfriend:]   Danny MY little brother called me cus he knows the samoans[.][5]  NOT WEASEL[.]

"[Fraysure:]  Lol[.]  Tell your bro to stop running his mouth[.]

"[Girlfriend:]  No mean to scare u[.]

"[Fraysure:]  Tell that nigga man[.]

"[Girlfriend:]   I did I called him rn he said he knows[.]  [A]nd he didn't think she'd text me.  [H]e said he knows better than to tell anyone[.]  He told me everything the guy said rn[.]

"[Fraysure]:  You went by both streets?

"[Girlfriend:]  No, I went on [C]lifford[6] where the cops were[.]  I know him."

Attached to the final text message from the girlfriend's phone (i.e., "I know him") were two photographs of the victim, Foisia.

In addition, cell phone records demonstrated that someone ran two dozen internet searches on Fraysure's phone for subjects related to the shooting in the hours and days following the crime.

---

[5] The defense gang expert testified the members of the Westside Piru gang with which Foisia was affiliated (discussed, *post*) are of "predominantly African-American and Samoan" heritage.

[6] The prosecution argued "Clifford [was] actually a misspelling of the street where the intersection of Milford and Lifford are[,] where the cops were" stationed after the shooting.

The searches included (1) numerous visits to a "Crimes in Carson" Facebook group, as early as 15 minutes after the shooting, (2) repeated visits to the Los Angeles County Sheriff's Department's "Twitter" posts concerning the shooting, (3) multiple searches for "Exodus Foisia," and (4) several visits to news articles concerning the shooting in the two days following the crime.

In response, defense counsel introduced a text exchange between Fraysure and a contact labeled "Kopo" in which Fraysure had "cleared his named" with respect to the shooting:

"[Fraysure:]  Wassup uce we cleared that up with the westsides and Scott parks[.]  [G]oodllooking [*sic*] out on giving me that heads up!

"[Kopo:]  Fasho you cleared yo name?

"[Fraysure:]  Yea foo[.]

"[Kopo:]  Fasho bro be safe[.]"

A gang expert testified that "clearing your name" in the gang context can mean either a person has been "proven innocent" of a crime, or could refer to "trying to make [another] gang think that it wasn't you" who committed the crime.

### 7.    *Gang-related evidence*

Defense counsel moved pretrial to bifurcate the section 186.22 gang allegation.  The court initially expressed "concerns of allowing a gang allegation on the little bit [the prosecution had] at [that] point" which indicated the shooting was gang-related.  Before ruling, however, the court invited the parties to submit further evidence and argument at a future hearing.

At such hearing, the prosecution presented a video taken during the party capturing many of the partygoers making Victoria Park Locos and Westside Piru gang signs.  One or more individuals captured in the video yelled, "Bang your set"—a phrase the

13

prosecution's gang expert testified means "to [t]hrow up your gang neighborhood, your gang[,] with your hands."

In addition, the prosecution proffered that photographs and expert testimony would establish that Fraysure was a member of the Victoria Park Locos, and that Foisia was at least connected with the Westside Piru gang. The prosecution also presented photographs of a memorial erected in honor of Foisia decorated with the number "220" in graffiti and a red hat bearing the letter "W," items consistent with the Westside Piru gang. And although the prosecutor conceded there was no "active rivalry" between the two gangs, he argued the gang evidence was relevant to motive because the shooting took place in Victoria Park Locos territory and did not appear to involve a robbery.

After observing that bifurcation presented "a difficult issue," the court denied the motion. The court, however, placed "certain limitations" on the gang evidence. The court ruled it would not allow any cumulative gang evidence, would exclude photographs of any firearms unconnected to the shooting, would not permit any gang expert to opine in a general matter on witness intimidation, and would provide a limiting instruction to the jury.

At trial, the court admitted several categories of gang-related evidence: (1) the video of partygoers making gang signs, (2) photographs and videos of Fraysure flashing gang signs, (3) photographs of items (including paper, a cup, and baseball caps) seized from Fraysure's room bearing gang writing; (4) autopsy photographs depicting Foisia's chest tattoo that read "Carson"— an area partially within the Westside Piru gang's territory, (5) photographs of Fraysure's various tattoos, which included an image of a revolver, (6) photographs of Foisia's memorial, (7) conviction records and testimony concerning two section 186.22

14

predicate offenses committed by other purported Victoria Park Locos gang members, and (8) testimony from a gang expert.

The gang expert testified about gang culture generally and the history of the Victoria Park Locos. Although the expert conceded Fraysure's tattoos were not explicitly gang-related, he nonetheless opined that Fraysure was a member of the Victoria Park Locos. The expert further testified the gang's primary activities were assault with a deadly weapon, felony vandalism, and possession of firearms. He also opined that a shooting like Foisia's could benefit a gang by intimidating community members and rival gangs.

In response, the defense presented its own gang expert who testified that several Crip gangs are active around the Carson area. The expert further testified that Crip gang members typically dress in blue and are rivals of the Piru gangs.

Defense counsel also elicited testimony from one of the detectives who responded to the shooting supporting that a rival Crip gang member might have robbed and murdered Foisia. On cross-examination, the detective testified the party's host "told [him] there [were] members of a Crip gang there." The detective further testified investigators did not find any gold chains on Foisia's body, despite being told by a family member that "he always wore them."

Finally, photographs taken during the party showed unidentified individuals dressed in blue. And a video captured three individuals, two dressed in blue, destroying Foisia's memorial. One of the individuals says, "On the hood. You see us though," while a second individual yells "Fuck Exodus!" as he kicks the memorial.

15

### E. *The Prosecution's Mid-Trial Disclosure of a Video[7] of Fraysure at the Party*

Halfway through trial, the prosecution disclosed it inadvertently had failed to produce two additional videos taken at the party which it intended to offer into evidence. The videos were largely duplicative of materials previously disclosed to the defense, but the court believed one of the videos showed Fraysure at the party.

Although the court "found absolutely no purposeful intention [to] withhold[ ] . . . evidence" by the prosecution, given the video's evidentiary significance, the court offered the defense two options: (1) a mistrial, or (2) complete exclusion of the video, including for impeachment purposes, from the trial already underway. The defense chose to go forward with the trial:

"The court: . . . Mr. Fletcher, how do you want to proceed?

"[Defense counsel]: Cautiously. The biggest problem I have is I've never had this situation before but I ultimately believe—not to B.S. anyone—it's Mr. Fraysure's decision. I've explained to him the options available. That we can have a mistrial and start all over again. We can go back essentially to status quo where we were at yesterday or we can have a mistrial, and he has indicated that he would like to go forward. Quite candidly he asked me[,] what should I do? I said I don't even know the legal ramifications.

"I understand the court's summary of the options. But understanding that the [video] is excluded for all purposes meaning

---

[7] The parties refer to the belatedly disclosed discovery as a video. The trial court, however, describes the discovery as a photograph. Our appellate record does not contain a copy of the discovery, as it was excluded at trial. We note, however, that whether the discovery was a photograph or a video is immaterial to our analysis.

no witnesses are going to make reference to it, it just doesn't happen[.]  I guess we can go forward.  But I say that and I'm just [']CYA['] because I didn't have an opportunity to go back and look at my obligations because I haven't gotten the other videos cleaned up yet.  So I'm willing to go forward.

"[¶] . . . [¶]

"[Defense counsel]:  One of the things that I've spoken to [Fraysure] about is I see [the video] as possibly being exculpatory because it is not a white shirt and the key it's going to turn on is the time of the pictures.  My video guy can't do the metadata stuff.

"The court:  You can preserve your right to ask for a mistrial at any time.  Right now, though, we will go forward based on Mr. Fraysure's thoughts and if information should change or if you want to renew this, you can.  But for right now let's go ahead and bring in the jury.  Just let us know if anything changes, but the court is preventing both sides from that [video] being even discussed or being introduced as evidence."

The defense never moved for a mistrial based on the belatedly produced video.

### F.    *Closing Arguments and Jury Instructions*

The prosecution devoted the first two-thirds of its closing argument to the non-gang-related evidence supporting Fraysure's guilt.  When the prosecutor pivoted to summarizing the gang evidence, he cautioned the jury:

"I just want to make it . . . clear that even though we've proven that [Fraysure] is a gang member[,] . . . you can't use that alone to convict someone or say that person has bad character.  You can't convict on just being a gangster.  It has got to be based on the evidence.  So make sure when you use or when you evaluate the

17

gang evidence in this case that you use it only for the purpose of determining whether or not the gang allegation is true."

The prosecutor also argued that the jury should "take into account the culture and the identity you have if you associate, if you are a member of a gang" because it affects a person's "mentality." Defense counsel objected, urging this amounted to an argument that, as a gang member, Fraysure possessed a propensity for crime. The court overruled the objection. The court did, however, instruct the jury before the closing argument that "the attorneys['] . . . remarks are not evidence." The court also provided the following limiting instruction concerning gang evidence:

"You may consider evidence of gang activity only for the limited purpose of deciding whether:

"A defendant acted with the intent, purpose and knowledge that are required to prove the gang-related allegations;

"or

"A defendant had a motive to commit the crimes charged.

"You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by an expert witness in reaching his or her opinion.

"You may not consider this evidence for any other purpose. You may not conclude from this evidence that a defendant is a person of bad character or that he has a disposition to commit crime."

The defense focused its closing argument on various weaknesses in the prosecution's case, including that Fuamatu, the key eyewitness, admitted to drinking the night of the party. Defense counsel also summarized the evidence supporting that an unidentified Crip had robbed and murdered Foisia.

18

### G. *Jury Request, Verdict, and Sentencing*

The jury commenced deliberations on December 1, 2021.  The next morning, the jury requested to view again the admitted party video (i.e., the video that shows partygoers flashing gang signs, but does not capture Fraysure attending the party).  That afternoon, the jury found Fraysure guilty of first degree murder.  In addition, the jury found true the section 12022.53 firearm enhancement and the section 186.22 gang allegation.

Following Fraysure's conviction, but prior to his sentencing, Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill No. 333) took effect.  (See *People v. Burgos* (2024) 16 Cal.5th 1, 7 (*Burgos*).)  The bill amended section 186.22 by, inter alia, narrowing the definitions of "criminal street gang," "common benefit," and "pattern of criminal gang activity."  (*Burgos*, *supra*, at p. 9.)

At sentencing, the trial court struck the jury's true finding on the section 186.22 gang allegation "based on the new law" established by Assembly Bill No. 333.  The court then imposed a sentence of 50 years to life in prison on the murder conviction and firearm use enhancement.

Fraysure timely appealed.

### DISCUSSION

Fraysure mounts four challenges to his conviction, arguing: (1) his waiver of the conflict with defense counsel was ineffectual, (2) the court erred in failing to bifurcate the gang allegation, (3) defense counsel rendered ineffective assistance by rejecting the court's offer of a mistrial following the belated disclosure of the

19

video showing Fraysure at the party, and (4) even if the individual errors do not compel reversal, their cumulative effect does.[8]

### A. *Fraysure Validly Waived His Right to Conflict-Free Counsel*

Fraysure contends his waiver of defense counsel's conflict was ineffectual. We disagree.

"A criminal defendant is guaranteed the right to the assistance of counsel by the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution. This constitutional right includes the correlative right to representation free from any conflict of interest that undermines counsel's loyalty to his or her client. [Citations.]" (*People v. Doolin* (2009) 45 Cal.4th 390, 417 (*Doolin*).) " 'As a general proposition, such conflicts "embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person or his own interests. [Citation.]" ' " (*Ibid.*) The Attorney General does not dispute that a conflict existed between Fraysure and his counsel.

"While the right to conflict-free counsel may generally be waived," a defendant's waiver must be a " 'knowing and intelligent act[ ] done with sufficient awareness of the relevant circumstances

---

[8] Fraysure's opening brief includes the additional argument that section 1109—which requires a court to try a gang enhancement separately from all other counts, if a defendant so requests (§ 1109)—applies retroactively and mandates reversal of his conviction. One month after Fraysure filed his opening brief, however, our Supreme Court held in *Burgos*, *supra*, that section 1109 does not apply retroactively. (*Burgos*, *supra*, 16 Cal.5th at p. 31.) In his reply brief, Fraysure does not contest that *Burgos* controls here. We therefore treat Fraysure's argument concerning section 1109 as abandoned.

20

and likely consequences.' [Citation.]" (*People v. Mroczko* (1983) 35 Cal.3d 86, 109–110 (*Mroczko*), disapproved on another ground in *Doolin*, *supra*, 45 Cal.4th at p. 421, fn. 22.)

Accordingly, although "[n]o particular form of inquiry is required," before accepting a waiver offered by the defendant, "the trial court must assure itself that (1) the defendant has discussed the potential drawbacks of [conflicted representation] with his attorney, or if he wishes, outside counsel, (2) . . . he has been made aware of the dangers and possible consequences of [the conflict], (3) . . . he knows of his right to conflict-free representation, and (4) . . . he voluntarily wishes to waive that right." (*Mroczko*, *supra*, 35 Cal.3d at p. 110.)

Contrary to Fraysure's argument, his waiver meets these requirements. The trial court expressly advised Fraysure that hiring Fletcher would create an "actual conflict of interest" because Fletcher was "currently being prosecuted for multiple felonies by the same exact office, the Los Angeles County District Attorney's Office, that [was] prosecuting" Fraysure. The court further explained the conflict created a risk that Fletcher "might lay down on [Fraysure's] case to gain a benefit for his own case." And the court warned Fraysure expressly: "[I]f you waive the conflict of interest, what it means is that . . . if you're found guilty or if you plead guilty in some way and you're sentenced to prison, and you suddenly look back at the case and you decide . . . I didn't like the way . . . Fletcher represented me . . . [because of the] conflict[,] . . . [¶] [w]hen you waive that conflict of interest, it means you can no longer argue that ever. You're precluded from raising that. It's done because you already told me[,] 'I don't care.' "

Fraysure confirmed orally he understood the court's warnings and nonetheless wished to waive the conflict. Fraysure then executed a written waiver, filed on his behalf by Fletcher, in which

21

he attested he was "aware that [he was] entitled to conflict[-]free representation," "aware that [he had] the right to speak with another completely independent attorney to discuss any alleged conflicts," and nonetheless "waiv[ed] any alleged conflict" between himself and Fletcher.

The record thus establishes Fraysure's waiver of his right to conflict-free representation was effective, knowing, intelligent, and voluntary.

Neither of Fraysure's arguments in opposition persuades us otherwise. First, Fraysure contends he did not understand Fletcher's prosecution created an *actual* conflict of interest because (1) the court failed to explain Fletcher's criminal charges stemmed from his misconduct as an attorney, (2) "it is unknown how Fletcher"—who "was not in court when [the judge] obtained [Fraysure's] waiver"—"would have characterized the conflict," and (3) the written waiver refers only to "any *alleged* conflict." (Italics added.) But as set forth, *ante*, the trial court expressly informed Fraysure the criminal prosecution against Fletcher created an "actual conflict of interest."

Second, Fraysure contends the court's warnings did not inform him of the full nature of the conflict because "the court failed to advise [him] that Fletcher's conflict of interest was also a financial one." (Boldface omitted.) Specifically, Fraysure argues he was unaware Fletcher had retained "a high profile attorney, Mark Geragos, to represent him in his criminal case." Fraysure urges that "Geragos'[s] fee was undoubtedly high," and Fletcher therefore "could not afford to lose out on his fee for handling [Fraysure's] case." Fraysure, however, fails to direct us to anything in the record substantiating his allegations of Geragos's fees or Fletcher's general financial condition, and we therefore treat this point as forfeited. (See *City of Santa Maria v. Adam* (2012) 211

22

Cal.App.4th 266, 287 ["[i]n order to demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record"].) In any case, the court adequately informed Fraysure of the perils of representation by Fletcher.

We therefore conclude Fraysure waived any claim that defense counsel's conflict of interest compels reversal.[9]

## B. *Any Error in Failing To Bifurcate the Gang Allegation Was Harmless*

Fraysure argues the trial court committed reversible error by refusing to bifurcate the gang allegation because "there was no evidence [that Foisia's] shooting . . . was gang related." (See *People v. Albarran* (2007) 149 Cal.App.4th 214, 217 (*Albarran*) [admission of gang evidence erroneous where the prosecution "failed to present sufficient evidence [the] crimes were gang motivated"].) Fraysure further argues he was "severely prejudiced" by the gang evidence because Fuamatu's eyewitness identification was suspect, and Fraysure's alleged gang membership therefore was "used to identify him as the shooter." (Boldface omitted.)

We conclude, however, any error by the court in failing to bifurcate the gang allegation was harmless. (See *People v. Tran* (2022) 13 Cal.5th 1169, 1209–1210 [unless gang evidence renders a trial "fundamentally unfair," error in failing to bifurcate a gang

---

[9] Accordingly, we do not address Fraysure's arguments concerning how the conflict allegedly impacted defense counsel's performance.

allegation is harmless where it is not "reasonably likely that a bifurcated trial would have changed the jury's verdict"].)[10]

Even accepting Fraysure's characterization of Fuamatu's testimony and the gang evidence, the prosecution's case was otherwise strong. Although Fraysure told investigators he did not attend the party, cell phone records established his phone sent a "pindrop" at or near the party's location to one of his contacts, along with text messages reading, "Come," and "[p]arty." Cell phone records also established Fraysure's phone placed or received nearly a dozen calls in the vicinity of the party in the hours leading up to the shooting. Analysis of the cell towers utilized by Fraysure's phone indicated its movement was consistent with Fraysure attending the party and then fleeing the scene of the crime. And two witnesses other than Fuamatu testified they saw Fraysure at the party.

In addition, forensic analysis revealed a significant amount of gunshot primer residue on the sweatshirt recovered from Fraysure's trunk, and ballistics analysis confirmed the bullet recovered from Foisia's body could have come from the handgun Fraysure is holding in photographs that predate the shooting. Finally, text messages, as well as the search history downloaded from Fraysure's phone, strongly supported Fraysure's consciousness of guilt in the days following the murder.

---

[10] Fraysure contends the appropriate inquiry is whether the court's refusal to bifurcate the gang allegation was harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18.) Although we disagree that *Chapman* supplies the governing standard (see *Tran*, *supra*, 13 Cal.5th at p. 1209), we conclude the admission of the gang evidence here was harmless under any standard of evaluating prejudice.

24

Nor are we persuaded that the gang evidence here was so irrelevant and "inflammatory" that it rendered Fraysure's trial fundamentally unfair. (See *Albarran*, *supra*, 149 Cal.App.4th at p. 232.) Some of the evidence—including the party video capturing partygoers flashing gang signs and autopsy photographs in which Foisia's "Carson" tattoo is visible—likely would have been admissible irrespective of any gang allegation. Moreover, the court placed "strict parameters" on the gang evidence, and the predicate offenses on which the prosecution relied to prove the gang allegation (possession of narcotics while armed and assault with a deadly weapon) were less serious than the murder charge against Fraysure. Finally, the court provided a limiting jury instruction concerning the gang evidence, and the prosecution emphasized in closing that the jury could not convict Fraysure merely for "being a gangster."

Accordingly, we are not persuaded the trial court committed reversible error by failing to bifurcate the gang allegation. (See *Tran*, *supra*, 13 Cal.5th at p. 1209.)

### C. *Fraysure Fails To Demonstrate any Prejudice from Defense Counsel's Allegedly Ineffective Assistance*

Fraysure contends defense counsel rendered ineffective assistance by rejecting the trial court's offer of a mistrial after the prosecution belatedly disclosed the video confirming he attended the party. In particular, Fraysure points to defense counsel's statement that he "[didn't] even know the legal ramifications" of the situation. (Italics omitted.) Fraysure, however, fails to demonstrate any prejudice resulting from this alleged deficiency in defense counsel's performance.

To prevail on a claim of ineffective assistance, a defendant "must establish his counsel's representation fell below an objective

25

standard of reasonableness and there is a reasonable probability that, but for counsel's deficient performance, the result of the trial would have been different." (*People v. Mesa* (2006) 144 Cal.App.4th 1000, 1007 (*Mesa*), citing *Strickland v. Washington* (1984) 466 U.S. 668, 686–687.) " ' "The burden of sustaining a charge of inadequate or ineffective representation is upon the defendant. The proof . . . must be a demonstrable reality and not a speculative matter." [Citation.]' [Citation.]" (*Mesa, supra,* at p. 1007.)

"In considering a claim of ineffective assistance of counsel, it is not necessary to determine ' "whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." ' [Citations.] It is not sufficient to show the alleged errors may have had some conceivable effect on the trial's outcome; the defendant must demonstrate a 'reasonable probability' that absent the errors the result would have been different. [Citations]." (*Mesa, supra,* 144 Cal.App.4th at p. 1008.)

Here, the court offered the defense two alternative remedies: (1) exclusion of the video from the trial already underway, or (2) a mistrial, which likely would be followed by a retrial at which the video would be admissible.[11] The defense elected the former

---

[11] Fraysure does not dispute that when a defendant makes a successful motion for mistrial based on a prosecutor's misconduct, retrial generally is barred only where the prosecutor acted with the intent to trigger a mistrial or otherwise improperly to thwart a likely acquittal. (See *People v. Batts* (2003) 30 Cal.4th 660, 665.) The court here found "no purposeful intention" by the prosecution

remedy, thereby preventing the prosecution from using the video to impeach Fraysure's pretrial statement to detectives denying he attended the party.

Now, with the benefit of hindsight, Fraysure argues "[t]he defense that [he] was not at the party was doomed from the start," and insists defense counsel should have chosen a mistrial. Fraysure speculates that, following the mistrial, he "would have obtained new counsel who would have . . . presented a competent mistaken eyewitness identification defense" at a retrial. He contends further this new counsel would argue that Fraysure's clothing in the video does not match Fuamatu's description of the shooter's clothing.[12]

Fraysure's arguments, however, are too speculative to demonstrate prejudice. (See *People v. Montoya* (2007) 149 Cal.App.4th 1139, 1147 ["[i]n demonstrating prejudice, the appellant 'must carry his burden of proving prejudice as a "demonstrable reality," not simply speculation as to the effect of the errors or omissions of counsel' "].)

Nor are we persuaded that a jury at a retrial might find the video exculpatory because it shows Fraysure at the party wearing clothing that does not match Fuamatu's description. The video directly impeaches Fraysure's prearrest statement to detectives

---

in neglecting to produce the video earlier. And although Fraysure faults defense counsel for failing to seek a continuance to "explore[ ]" the reasons for the belated disclosure, Fraysure does not challenge the court's finding.

[12] Although our appellate record does not include a copy of the video, we assume for purposes of argument that Fraysure's clothing in the video does not match Fuamatu's description of Fraysure as wearing a white T-shirt and later changing into a gray sweatshirt at the party.

that he did not attend the party, and suggests his consciousness of guilt.

Fraysure thus fails to demonstrate any prejudice from defense counsel's allegedly ineffective assistance.

### D.    *Fraysure's Cumulative Error Argument Fails*

Fraysure has failed to demonstrate any error by the trial court in accepting his waiver of defense counsel's conflict.  And the case against Fraysure was very strong.  Thus, we are not persuaded the cumulative effect of any error by the court in failing to bifurcate the gang allegation or by defense counsel in rejecting the mistrial offer resulted in prejudice.  (See *People v. Poletti* (2015) 240 Cal.App.4th 1191, 1216.)

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.


                                        ROTHSCHILD, P. J.

We concur:



                WEINGART, J.



                M. KIM, J.


28